IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

| | | |
|---|---|---|
| KIRBY INLAND MARINE, LP | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | No. 3:19-cv-00207 |
| | § | |
| FPG SHIPHOLDING PANAMA | § | |
| 47 S.A., K-LINE ENERGY SHIP | § | |
| MANAGEMENT, and the VLGC | § | |
| GENESIS RIVER, *in rem* | § | |
| | § | |
| Defendants. | § | |

********************

| | | |
|---|---|---|
| IN THE MATTER OF KIRBY | § | |
| INLAND MARINE, LP, in a cause of | § | |
| exoneration from or limitation of | § | Rule 9(h) Admiralty |
| liability | | |

********************

Consolidated with

| | | |
|---|---|---|
| IN THE MATTER OF THE | § | |
| COMPLAINT OF FPG | § | |
| SHIPHOLDING PANAMA 47 S.A. | § | |
| SHIP NO. 138 CO. LTD., ET AL, in a | § | Rule 9(h) – Admiralty |
| cause for exoneration from or | § | |
| limitation of liability | | |

## KIRBY INLAND MARINE, LP'S POST-TRIAL BRIEF

At trial, the Genesis River Interests admitted fault for the first time, after

denying any responsibility for the collision and subsequent oil spill cleanup. Further,

the Genesis River Interests' expert admitted that Captain Marie was not negligent,

and that the VLGC GENESIS RIVER violated the Rules of the Road and endangered

the M/V VOYAGER and her crew. The Genesis River Interests are 100% at fault for the collision.

## I.   BACKGROUND

1.     This case arises out of a May 10, 2019 collision in the Houston Ship Channel ("Channel"). The VLGC GENESIS RIVER, owned by FPG Shipholding Panama 47 S.A. ("FPG") and operated by "K" Line Energy Ship Management Co., Ltd. ("K-Line"), collided with the KIRBY 30015T barge pushed by the M/V VOYAGER, owned and operated by Kirby Inland Marine, LP ("Kirby"). The collision resulted in the discharge of reformate from the KIRBY 30015T.

2.     Kirby and the Genesis River Interests (FPG, K-Line, Ship No. 138 Co. Ltd., Ship No. 139 Co. Ltd., and Genesis River Shipping, S.A.) separately filed Petitions for Exoneration From or Limitation of Liability pursuant to 46 U.S.C. § 30505, *et seq.* ("Limitation Act"), which were consolidated. (#310.)

3.     In each case, the Court issued a monition ordering that all potential claimants file their claims in the limitation proceedings by a date certain and that claimants desiring to contest petitioners' rights to exoneration or limitation of liability file answers by the same date. (#5, #8 in C.A. No. 3:19-cv-372.)

4.     In response to the monition, numerous claimants filed answers and claims against petitioners for damages allegedly resulting from the collision under general maritime law, the Oil Pollution Act of 1990 ("OPA"), and other state laws.

2

5.     Kirby maintains that the Genesis River Interests were the sole cause of the collision. Kirby asserts claims for contribution and subrogation under OPA against the Genesis River Interests for Kirby's removal costs and claimants' alleged damages. Kirby and the Genesis River Interests have also brought claims against each other for damages to their vessels.

6.     The Genesis River Interests filed a third-party complaint against BW VLGC Limited and BW Fleet Management AS ("BW Oak Interests") alleging that the VLGC BW OAK embarrassed the navigation of the VLGC GENESIS RIVER before its meeting with the M/V VOYAGER. (#12.)

7.     The Court bifurcated this case on the issues of liability and damages.

8.     A bench trial on the issues of allocation of fault and exoneration from or limitation of liability under the Limitation Act and OPA was held on February 2-5, 2021. The Court heard live testimony from Tony Marie, Relief Captain of the M/V VOYAGER, and from Kirby's corporate representative, Executive Vice President James Guidry. The Court also heard live testimony from Kirby's experts, Captains Steven Cunningham and John Sutton. The Genesis River Interests called no fact witnesses at trial, presenting only their retained experts Captain Steven Richter, Captain Willard Breathwit, Jr., and Professor Paul Sclavounos. The BW Oak Interests presented fact witness testimony from the pilot of the VLGC BW OAK, Kent Barton, and expert testimony from Captain Kevin Highfield. Kirby and the BW Oak Interests

presented video deposition testimony of Captains Jason Charpentier and Barry Holland, the Houston Pilots aboard the VLGC GENESIS RIVER; the VLGC GENESIS RIVER's crew, including Master Kevin Barnes, Chief Officer Santosh Badgujar, Second Officer Guarav Upadhyay, and Able Seaman Severo Montero; and Dudley Bourg Jr., the Relief Captain aboard the M/V PROVIDER, which was transiting behind the M/V VOYAGER.

9.    The parties presented recordings from the day of the collision and navigational data, including playbacks of the RosePoint Electronic Chart System ("ECS") from the M/V VOYAGER, the voyage data recorder ("VDR") from the VLGC GENESIS RIVER, and the personal pilot unit ("PPU") from Pilot Charpentier. The Court additionally viewed a videorecording from the bridge of the M/V VOYAGER.

10.    The Court received expert reports submitted by the parties, which were admitted as exhibits at trial, and reviewed deposition testimony designated by the parties.

11.    The testimony, exhibits, expert reports, post-trial briefing, and governing law support findings that

(a) The VLGC GENESIS RIVER was 100% at fault, and the M/V VOYAGER was 0% at fault for the collision;

(b) Kirby is exonerated from all fault relative to the collision;

4

(c) Kirby was not negligent, the M/V VOYAGER did not violate the Rules of the Road, and the M/V VOYAGER was seaworthy;

(d) the Genesis River Interests were negligent and the VLGC GENESIS RIVER violated the Rules of the Road, such that the Genesis River Interests' liability is not limited under OPA. Further, the VLGC GENESIS RIVER was unseaworthy;

(e) the discharge of reformate was solely caused by the Genesis River Interests such that the Genesis River Interests shall be treated as the responsible party under OPA; and

(f) the Genesis River Interests are liable to Kirby, through subrogation and contribution, for Kirby's own damages, removal costs, and claimants' alleged damages. The VLGC GENESIS RIVER, *in rem*, and the Genesis River Interests, *in personam*, are liable for Kirby's damages at maritime law.

## II.   FACTUAL SUPPORT

### a.   The Parties

12.    Kirby is a Delaware limited partnership and the owner and operator of the M/V VOYAGER and the barges KIRBY 30015T and MMI 3041. Kirby is the largest inland and offshore barge company in the U.S. (2 Tr. 288.) Kirby's training program for its wheelmen exceeds U.S. Coast Guard requirements, and, as noted by

the Genesis River Interests' expert, Captain Breathwit, Kirby is a leader in the Responsible Carrier's Program. (*Id.* 289-90; 3 Tr. 33.)

13.    FPG is a corporation organized under the laws of the Republic of Panama. (#1 in C.A. No. 3:19-cv-372.) FPG was a registered owner of the VLGC GENESIS RIVER. *Id.*

14.    Ship No. 138 Co. Ltd. and Ship No. 139 Co. Ltd. are corporations organized under the laws of Japan. Ship No. 138 and 139 were owners of the VLGC GENESIS RIVER. *Id.*

15.    Genesis River Shipping, S.A. is a corporation organized under the laws of the Republic of Panama. *Id.* Genesis River Shipping was a bareboat charterer of the VLGC GENESIS RIVER. *Id.*

16.    K-Line is a corporation organized under the laws of Japan. *Id.* K-Line was the manager of the VLGC GENESIS RIVER. *Id.*

17.    BW VLGC Limited and BW Fleet Management AS are foreign business entities with their principal places of business in Norway. (#12.) BW VLGC Limited was the registered owner of the VLGC BW OAK. (*Id.*) BW Fleet Management AS was the manager of the VLGC BW OAK. (*Id.*)

### b. The Vessels

18.    The M/V VOYAGER is a 1,700-horsepower towing vessel of 155 gross tons, with approximate dimensions of 68.9 feet in length and 26.1 feet in breadth.

(Kirby-1.) At the time of the collision, the M/V VOYAGER was pushing two 297.5 feet x 54.0 feet x 12.0 feet double hull tank barges—the KIRBY 30015T and MMI 3041—fully loaded with reformate. The M/V VOYAGER had a draft of 8.0-9.5 feet. (2 Tr. 8.) The barges had a draft of 10.0 feet and were in a side-by-side configuration, which is common on the Channel. (2 Tr. 134-35.) The gross registered tonnage of each barge was 1,619. (Kirby-49, 50.)

19.     At the time of the collision, the M/V VOYAGER was piloted by Captain Marie. (2 Tr. 136.) The M/V VOYAGER was equipped with radar, VHF radio, RosePoint ECS, and Automatic Identification System ("AIS"). (Kirby-42 at 5; 2 Tr. 138, 142.)

20.     The VLGC GENESIS RIVER is a Panamanian-flagged LPG tanker of 46,794 gross tons, with approximate dimensions of 229.9 meters in length, 37.2 meters in breadth, and 21.0 meters in depth. (Genesis River 49; #1 in C.A. No. 3:19-cv-372.)

21.     According to the VLGC GENESIS RIVER's Passage Plan, which was prepared by her crew before she departed the dock, the ship's maximum speed should have been 6-8 knots in the area where the collision occurred. (Kirby-61 at 7, table entry no. 28; 1 Tr. 97.)

22.     At the time of the collision, the VLGC GENESIS RIVER bridge was manned by a four-person crew and equipped with two radars, AIS, and an Electronic Chart Display and Information System ("ECDIS"), which has the official and required

7

nautical charts for the areas to be transited. (1 Tr. 110-13.) Under U.S. law, international law, and K-Line policy, the VLGC GENESIS RIVER was required to navigate using its ECDIS. (*Id.* 110-11.) However, the crew turned off the ECDIS and radars, in violation of the law. (*Id.* 108-111, 216; 4 Tr. 103-04.)

23.     The Houston Pilots aboard the VLGC GENESIS RIVER had a PPU, which is a tool used by pilots to aid in navigation. (1 Tr. 112.) The PPU is not an ECDIS and does not have official charts. (*Id.*) Further, the crew of the VLGC GENESIS RIVER were not using the pilot's PPU and had no training or familiarization with it. (*Id.*; *id.* 147.)

### c.  The Vessel Crews

#### i.  Captain Tony Marie

24.     Captain Marie held an active, valid U.S Coast Guard license to operate towing vessels. (2 Tr. 99; Kirby-121.) Captain Marie was also a U.S. Coast Guard designated examiner, which means that he was approved to assess and train steersmen. (2 Tr. 115-16.)

25.     Like all other Kirby wheelmen, Captain Marie completed Kirby's robust, industry-leading training program, which included state of the art simulator training. (*Id.* 103; Kirby-11-15, 27-29.) Captain Marie was properly trained in navigation, vessel operation, Rules of the Road, radar use, and pilothouse management. (Kirby-5,

16-17.) At the time of the collision, Captain Marie was current on Kirby's required training courses, including navigation training. (*Id*.)

26.     In 1998, Captain Marie was hired as a deckhand by Hollywood Marine, which merged into Kirby within two years. (2 Tr. 90.) After working his way up in the company and completing the required training, Captain Marie began piloting towboats for Kirby in 2007. (*Id*. 97-98.) In his more than 10 years piloting towboats, Captain Marie had only a few incidents, none of which are relevant to the May 10, 2019 collision. (*Id*. 106-07.) Before May 10, 2019, Captain Marie had never collided with another vessel.

27.     Captain Marie's performance is evaluated annually, pursuant to Kirby policy, and he regularly received above-average reviews. (Kirby-5, 16-17; Wheat Dep. 40:4-14.) In addition, Captain Marie successfully passed navigation audits, including a third-party audit in 2017. (2 Tr. 291-96; Kirby 6, 8.)

28.     Captain Marie was observed to be a good wheelman by those in a position to evaluate his skills. (2 Tr. 297.) Captain John Wheat, the permanent captain of the M/V VOYAGER, worked with Captain Marie on the vessel for seven years and "always had high regards on the way he handled the boat, the tow, how he handled things." (Wheat Dep. 38:3-9, 44:3-5.) Captain Wheat frequently observed Captain Marie and had no concerns about his navigation abilities or competence. (*Id.* 38:13-23, 39:5-13.) In a 2019 assessment, Captain Wheat noted that Captain Marie "handles the

boat and tow good with constant awareness and always plans ahead for situations." (Kirby-5.)

### ii. Pilot Jason Charpentier

29.     The Channel has compulsory pilotage by local Houston Pilots for all foreign vessels. (1 Tr. 148.) At the time of the collision, the VLGC GENESIS RIVER was piloted by Houston Pilot Charpentier. (Charpentier Dep. 67:10-12.) Houston Pilot Holland was at the helm of the VLGC GENESIS RIVER before Captain Charpentier relieved him and was also on the bridge of the VLGC GENESIS RIVER when the collision occurred. (Holland Dep. 75:22-24, 80:9-12, 84:15-24, 82:5-22.)

### iii. The VLCG GENESIS RIVER's Crew

30.     The bridge team, with the pilot, are required to work together to safely navigate the vessel and eliminate single-point failures. (1 Tr. 113.) On May 10, 2019, the VLGC GENESIS RIVER bridge was manned by a four-person crew, including the chief officer, second officer, helmsman, and pilot. (*Id.*)

31.     Even when a pilot is aboard a ship, the master or highest-ranking crew member on duty has ultimate responsibility for safe navigation of the vessel. (*Id.* 113; Kirby-54.) The crew member in charge of the wheelhouse has full overriding authority over the pilot. (1 Tr. 113.) The master was the highest-ranking person on the VLGC GENESIS RIVER. (*Id.* 58.) However, at the time of the collision, the chief officer was

the highest-ranking officer on duty because the master was sleeping after taking shore leave until 4:00 a.m. that morning. (*Id.* 115.)

### d. The Channel

32.    The Channel is a manmade waterway and a busy shipping area. The main channel is 530 feet wide with a project depth of 45 feet to accommodate deep draft vessels. (Kirby-33.) On each side of the main channel are barge lanes that extend another 235 feet on either side with a project depth of 12 feet, which varies in reality. (*Id.*; 1 Tr. 69-70.)



(Kirby-33.)

33.    Outbound vessels transit the green side of the Channel, and inbound vessels transit the red side. (1 Tr. 71.)

34.    Vessel traffic on the Channel is monitored by Vessel Traffic Services ("VTS"), which is operated by the U.S. Coast Guard. (*Id.* 80.) Channel 13 is used for vessel-to-vessel communication. (*Id.*)

### e. The Vessels' Voyages

### i. On the VLGC GENESIS RIVER

35.     On the evening before the collision, the VLGC GENESIS RIVER's master, second officer, and first engineer took shore leave and consumed alcohol. (1 Tr. 114.) The crew did not return to the vessel until approximately 4 a.m. on the morning of the collision. (*Id.*) The master admitted to the presence of alcohol in his bloodstream but did not undergo any alcohol testing upon returning to the vessel. (*Id.* 115-16.)

36.     The crew knowingly intended to violate K-Line's policy, which prohibited any crew member from consuming alcohol within four hours of returning to the ship and required the crew to have a blood alcohol content of zero when boarding the ship and during port stay. (*Id.* 114-15; Kirby-74, 78.)

37.     The morning of May 10, 2019, Pilots Charpentier and Holland boarded the VLGC GENESIS RIVER at the Targa terminal to navigate the vessel out of the Channel. (Charpentier Dep. 44:17-19.)

38.     The pilots and crew engaged in a limited master/pilot exchange. (1 Tr. 106-08, 159.) In violation of K-Line policy, the crew failed to inform the pilots that the VLGC GENESIS RIVER was a sluggish vessel, which was common knowledge among the crew. (Barnes Dep. 189:16-190:2; Badjugar Dep. 28:19-29:2.) The crew also failed to advise the pilots of the crew's risk assessment or review the crew's

Passage Plan, which included the vessel's maximum safe speed of 6-8 knots in the area of the collision. (Barnes Dep. 87:23-88:25; Badjugar Dep. 64:6-64:16; Kirby-53.)

39.     Before leaving the dock, the pilots asked the crew to *silence* the alarms on the radars and ECDIS. (1 Tr. 108-111.) Instead, without further discussion, the crew completely disabled this critical navigational equipment by placing it in standby mode. (*Id.*)

40.     The VLGC GENESIS RIVER departed the terminal at noon, with Captain Holland at the con. (*Id.* 116.) While the vessel was transiting outbound on the green side of the Channel, the master assigned his navigational responsibilities to the chief officer, who had worked overnight and during early morning cargo operations. (*Id.*)

41.     Around 14:44, Captain Charpentier relieved Captain Holland, who informed Captain Charpentier that the VLGC GENESIS RIVER was a poor handling ship. (2 Tr. 79-80; Kirby-39.) Nevertheless, within minutes, and without any objection from the crew, Captain Charpentier ordered the engine to Full Ahead, and then Navigation Full Ahead, also known as Full Sea Speed. (Kirby-39, 103.)

### ii. The VLGC GENESIS RIVER Sheered to the Wrong Side of the Channel

42.     Near the Bayport Flare, the VLGC GENESIS RIVER and the inbound VLGC BW OAK met on a port-to-port, one-whistle passing agreement. The VLGC

GENESIS RIVER was traveling at approximately 12.6 knots, which exceeded the safe speed in the Passage Plan. (Kirby-103.)

43.     After the meeting, the VLGC GENESIS RIVER started swinging uncontrollably to port. (1 Tr. 86, 120.)

44.     The M/V VOYAGER was transiting in the barge lane on the red side of the Channel, opposite the VLGC GENESIS RIVER, at approximately 6 miles per hour. (*Id.* 71; 2 Tr. 29, 278.) The M/V VOYAGER was hugging the outer limits of the barge lane, where she was supposed to be. (2 Tr. 71, 238.)

45.     Around 15:12, Captain Charpentier radioed the M/V VOYAGER for the first time, and Captain Marie immediately responded:

| 15:12:53 | Charpentier | "Come in there, Voyager." |
| 15:12:56 | Marie | Responds. |
| 15:12:59 | Charpentier | "It's that ship looking at ya . . . trying to check this thing . . . just keep an eye on me. |
| 15:13:04 | Marie | "Roger, roger." |

(Kirby-39, 103; 2 Tr. 251.)

46.     Captain Marie could only hear the radio communications from Captain Charpentier. (2 Tr. 249.) Unbeknownst to Captain Marie, the VLGC GENESIS RIVER had lost control and, soon after this exchange, Captain Charpentier asked the

14

crew for "more RPMs . . . give me everything you've got" to try to regain control. (Kirby-39, 103.)

47.    Then, Captain Charpentier radioed Captain Marie a second time:

| 15:13:17 | Charpentier | "She's not checking up, Voyager." |
| 15:13:20 | Marie | "What do you need me to do?" |
| 15:13:24 | Charpentier | "Go to the greens." |
| 15:13:25 | Marie | "Go to the greens." |

(Kirby-39, 103.)

48.    This communication established a starboard-to-starboard, two-whistle passing agreement. (2 Tr. 160.) The following still from the M/V VOYAGER's video playback, annotated by Captain Cunningham, depicts Captain Marie's view when he agreed to go to the greens.



(Kirby-34; 2 Tr. 243.)

49.      Captain Marie immediately steered hard to port to comply with the

passing agreement. (2 Tr. 161.) However, Captain Charpentier then called a third time:

| 15:13:54 | Charpentier | "You need to go straight to the greens . . . take a ninety to the greens cos I'm going to go your way again, probably." |
| 15:13:59 | Marie | "Roger roger, straight over." |

(Kirby-39, 103.)

50.      As Captain Marie executed his maneuver to port, the VLCG GENESIS

RIVER crossed the centerline of the Channel, entered the barge lane where the M/V

VOYAGER had been transiting, then sheered a second time—back toward the

escaping M/V VOYAGER. (Kirby-41.)

51.      After the VLGC GENESIS RIVER took the initial sheer, Captain

Charpentier asked for additional RPMs to try to break the sheer. (Kirby-103; 2 Tr. 73-

74.) The crew failed to override the engine bypass program, which would have

increased the available RPMs. (1 Tr. 121-22.) Captain Charpentier testified that he

would have been able to break the sheer and maintain the passing agreement if he had

gotten those additional RPMs. (2 Tr. 74.) Instead, the VLGC GENESIS RIVER failed

to make the passing and sheered a second time into the M/V VOYAGER. But for the

second sheer, Captain Charpentier testified that the VLGC GENESIS RIVER would

have cleared the M/V VOYAGER. (*Id.* 78.)

52.     Just three minutes and 16 seconds after Captain Charpentier first called the M/V VOYAGER, the hull of the VLCG GENESIS RIVER sliced through the KIRBY 30015T, resulting in the spill of reformate into the Channel. (*Id.* 249.) The force of the impact also caused the MMI 3041 to capsize. (Kirby-103.)



(Kirby-120.)

### iii.   On the M/V VOYAGER

53.     Captain Marie first saw the VLGC GENESIS RIVER before it met the VLGC BW OAK. (2 Tr. 152.) He did not observe or hear anything unusual. (*Id.*) As noted by Captain Bourg, everything was fine until the VLGC GENESIS RIVER crossed the Channel. (Bourg Dep. 43:3-6.)

54.     At the time of the first radio call, Captain Marie had no reason to anticipate that the VLGC GENESIS RIVER would sheer across the Channel because the vessel had not yet crossed the centerline. (2 Tr. 252; 1 Tr. 132.)



(Kirby-36.)

55.     Only 30 seconds elapsed between the first call and Captain Charpentier's request that Captain Marie go to the greens. (2 Tr. 243.) When Captain Charpentier asked Captain Marie to go to the greens, Captain Marie only knew that the VLGC GENESIS RIVER was "not checking up." (*Id*. 239-40, 249.)

56.     Captain Marie did not know what the VLGC GENESIS RIVER would do once it sheered across the Channel. (2 Tr. 161.) He thought that the vessel might ground, slow and anchor, or stay on the red side to pass as agreed. (*Id.* 162.) However, after plowing into the barge lane where the M/V VOYAGER had been traveling, the VLGC GENESIS RIVER took a second sheer. (*Id.* 165-66.)

57.     Captain Charpentier never told Captain Marie that the VLGC GENESIS RIVER would sheer a second time—back toward the escaping M/V VOYAGER—until *after* Captain Marie committed to go to port. (*Id.* 161-62.) At this point, Captain Marie was committed to the port maneuver and was unable to take any further evasive action. (*Id.* 162.)

58.     Captains Marie and Charpentier testified that, if the vessels had successfully carried out the passing agreement, the collision would have never happened. (*Id.* 165; Charpentier Dep. 205:14-25.) In fact, Captain Marie successfully carried out the agreement and could see the starboard side of the VLGC GENESIS RIVER before the second sheer. (2 Tr. 165; Charpentier Dep. 205:14-21.)

## III.   LEGAL SUPPORT

### a. Authorities

59.     This Court has jurisdiction over the parties' maritime claims pursuant to 28 U.S.C. § 1333, Rule 9(h) of the Federal Rules of Civil Procedure, and Supplemental

Admiralty Rules C and F. This Court also has jurisdiction over the parties' claims under OPA. 33 U.S.C. § 2717(b).

60.     Venue is proper in the Southern District of Texas pursuant to Supplemental Admiralty Rule F(9) and 33 U.S.C. § 2717(b) of OPA.

61.     Maritime claims for negligence are subject to the Limitation Act, which limits a shipowner's liability for a collision to the value of its vessel if the owner had no knowledge or privity of the negligence or unseaworthiness that caused the accident. *See Trico Marine Assets Inc. v. Diamond B Marine Servs., Inc.*, 332 F.3d 779, 789-90 (5th Cir. 2003).

62.     In a limitation proceeding, the Court follows a two-step process. First, "the court must determine what acts of negligence or conditions of unseaworthiness caused the accident. Second, the court must determine whether the shipowner had knowledge or privity of those same acts of negligence or conditions of unseaworthiness." *Farrell Lines Inc. v. Jones*, 530 F.2d 7, 10 (5th Cir. 1976).

63.     To support a negligence cause of action at maritime law, a plaintiff has the burden of proving that: (1) the defendant owed the plaintiff a duty; (2) the defendant breached that duty; and (3) the breach caused the plaintiff's alleged injuries. *Canal Barge Co. v. Torco Oil Co.*, 220 F.3d 370, 376 (5th Cir. 2000). The duty owed is a question of law. *Id.* at 376. Whether the duty was breached is a question of fact. *Id.*

64.     The claimants carry the initial burden to prove that some fault on the part of the vessel as to which exoneration or limitation is sought was a proximate cause of the casualty. *See Farrell Lines Inc.*, 530 F.2d at 10.

65.     When a vessel involved in a maritime collision is shown to have violated the Rules of the Road or another statute or regulation relating to the navigation of vessels, a presumption of causation arises against the vessel. *See The Pennsylvania*, 86 U.S. 125, 135 (1873); *Penrod Drilling Co. v. Inland Oil & Transp. Co.*, 561 F. Supp. 810, 815 (E.D. La. 1983).

66.     Once a claimant shows fault on the part of a vessel, the vessel owner has the burden of showing that it did not have "privity or knowledge" of the conduct or condition causing the incident. *See In re Hellenic Inc.*, 252 F.3d 391, 394 (5th Cir. 2001).

67.     "The owner's duty is essentially satisfied when he properly equips the vessel and selects competent crew to operate it." *MO Barge Lines, Inc. v. Belterra Resort Ind., LLC*, 360 F.3d 885, 891 (8th Cir. 2004).

68.     Here, Kirby and the Genesis River Interests both seek exoneration and/or limitation of liability under general maritime law. The parties also seek limitation of liability under OPA, which does not apply if the incident was proximately caused by a party's rule violation, gross negligence, or willful misconduct. 33 U.S.C. § 2704(c).

OPA's liability caps are based on the type and tonnage of the vessel. 33 U.S.C. § 2704;

33 C.F.R. § 138.230(a) (eff. Dec. 21, 2015 – Nov. 11, 2019).

> **b. The M/V VOYAGER Complied With the Rules of the Road; the VLGC GENESIS RIVER Violated the Rules of the Road**

69.     The vessels were operating under Inland Navigation Rules, 33 C.F.R. §

83.01, *et. seq.* ("Rules of the Road"), which apply to all vessels upon the inland waters

of the United States. (*See* Rule 1.) The purpose of the Rules of the Road is to prevent

ship collisions. *See Schumacher v. Cooper*, 850 F. Supp. 438, 449 (D.S.C. 1994)

(internal citations omitted). Rules 5, 6, 7, and 9 are most relevant to the vessels' actions.

70.     Navigational Rule 5, "Look-out," provides:

> Every vessel shall at all times maintain a proper look-out by sight and hearing as well as by all available means appropriate in the prevailing circumstances and conditions so as to make a full appraisal of the situation and of the risk of collision.

33 C.F.R. § 83.05.

71.     The VLGC GENESIS RIVER violated Rule 5 by failing to utilize the

radars and ECDIS onboard as "all available means" to keep a proper lookout. (4 Tr.

103.) The Genesis River Interests' expert, Captain Richter, admitted that Captain

Charpentier lost situational awareness. (3 Tr. 147-48.)

72.     Navigational Rule 6, "Safe Speed," provides in part:

> Every vessel shall at all times proceed at a safe speed so that she can take proper and effective action to avoid collision and be stopped within a distance appropriate to the prevailing circumstances and conditions.

33 C.F.R. § 83.06.

73.     Moments prior to losing control, the VLGC GENESIS RIVER was traveling at 12.6 knots, *i.e.*, 50 percent faster than the maximum 8 knots allowed by its own Passage Plan, in direct violation of Rule 6. (1 Tr. 102.) Captain Richter admitted that the VLGC GENESIS RIVER was traveling too fast. (3 Tr. 245.)

74.     Navigational Rule 7, "Risk of Collision," provides in pertinent part that

> (a) Every vessel shall use all available means appropriate to the prevailing circumstances and conditions to determine if risk of collision exists. If there is any doubt such risk shall be deemed to exist.
> (b) Proper use shall be made of radar equipment if fitted and operational, including long-range scanning to obtain early warning of risk of collision and radar plotting or equivalent systematic observation of detected objects.

33 C.F.R. § 83.07.

75.     The VLGC GENESIS RIVER violated Rule 7 by failing to use radars and ECDIS. (1 Tr. 110.) Further, only the VLGC GENESIS RIVER knew the full risk of collision, since the M/V VOYAGER could not hear the chaotic, internal exchanges between Captain Charpentier and the bridge team.

76.     Navigational Rule 9, "Narrow Channels," provides:

> (a)(i) A vessel proceeding along the course of a narrow channel or fairway shall keep as near to the outer limit of the channel or fairway which lies on her starboard side as is safe and practicable.

33 C.F.R. § 83.09.

77.     As admitted by Captain Charpentier, the VLGC GENESIS RIVER violated Rule 9 when it crossed the centerline of the Channel. (2 Tr. 73.) Violation of Rule 9 is considered to be a "most serious statutory fault," and, as noted in the Genesis River Interests' own briefing (#498), "[c]ourts have rigidly enforced this rule as an important safety regulation." *The Standella*, 108 F.2d 619, 620 (5th Cir. 1939). By crossing to the wrong side of the Channel, the VLGC GENESIS RIVER violated Rule 9 and placed the M/V VOYAGER in danger. (1 Tr. 91, 125.)

78.     The M/V VOYAGER fully complied with the Rules of the Road. (2 Tr. 255-56; Charpentier Dep. 76:10-17; 117:12-16.) However, the VLGC GENESIS RIVER violated multiple Rules. Under established law, a presumption of causation arises against the VLGC GENESIS RIVER. In addition, because the VLGC GENESIS RIVER violated the Rules of the Road and safety regulations, OPA liability caps do not apply. *See* 33 C.F.R. §§ 83.05, 83.06, 83.07, 83.09, 83.14; 33 C.F.R. § 164.11(k),(r) (requiring operable navigational equipment; requiring crew to inform pilot of maneuvering characteristics, vessel peculiarities).

### c.   Kirby Was Not Negligent, and the M/V VOYAGER Was Seaworthy

79.     Captain Marie immediately responded when called by Captain Charpentier. (1 Tr. 89; 2 Tr. 238-39.) He then evaluated his options and decided that

his best option—the only escape route—was to go to port. (1 Tr. 89; 2 Tr. 154-55, 249-50.)

80.     As recognized by the Genesis River Interests' own experts, Captain Charpentier had superior knowledge, and Captain Marie did not know what was happening on the bridge of the VLGC GENESIS RIVER when he decided to comply with Captain Charpentier's request and go to the greens. (3 Tr. 40, 61.)

81.     It was also no surprise that the M/V VOYAGER would slow when turning to port. Captain Charpentier could see the M/V VOYAGER's speed before he made the request and knew that the M/V VOYAGER would lose speed. (Charpentier Dep. 139:19-140:2, 158:18-159:5.)

82.     Perhaps most telling—the VLGC GENESIS RIVER's own expert, Captain Richter, testified at trial:

> I don't think Tony was negligent.
>
> Given the choices that were before him. . . . none of them were good options.

(3 Tr. 236, 241.)

83.     The pilots aboard the VLGC GENESIS RIVER also testified that the M/V VOYAGER did nothing wrong. (2 Tr. 78.)

84.     The M/V VOYAGER was seaworthy, fit for her intended purpose, appropriately manned with a competent crew, and did not violate any Rules of the Road. (2 Tr. 255.)

### d.  The M/V VOYAGER Was *In Extremis*

85.    Even assuming that Captain Marie had a better option, which he did not, the *in extremis* doctrine provides that the decisions of a navigator in Captain Marie's position are to be leniently judged when his vessel is put in sudden peril through no fault of its own. *Grosse Ile Bridge Co. v. Am. S.S. Co.*, 302 F.3d 616, 625 (6th Cir. 2002). The Fifth Circuit has long held that

> the one who is put to a sudden choice of action to avoid hazard created by the patent fault of the other has considerable latitude. The choices of stopping engines or going ahead, going to port rather than starboard, are to be judged not by an armchaired admiral, who has hours, days, weeks, months or years to reflect, but in the light of choices suddenly forced on by the neglect of the one now seeking total absolution.

*Afran Transp. Co. v. S.S. Transcolorado*, 458 F.2d 164, 166-67 (5th Cir. 1972) (citation omitted); *see also Union Oil Co. of Cal. v. Tug Mary Malloy*, 414 F.2d 669, 674 (5th Cir. 1969).

86.    The Fifth Circuit has found, for example, that "[a] sheer by one vessel into another resulting in collision raises a presumption of negligence on the part of the sheering vessel," and "the presumptively negligent party has the burden of coming forward with proof that the cause of the accident in no way resulted from a failure of due care on its part." *Atkins v. Lorentzen*, 328 F.2d 66, 68, 69 (5th Cir. 1964); *see also Profit Shipping, Ltd. v. M/V IMPERIAL SPIRIT*, 2015 WL 10371483, at *6 (S.D. Tex. Nov. 30, 2015).

87.     The VLGC GENESIS RIVER placed the M/V VOYAGER *in extremis.* (2 Tr. 247-48.) Accordingly, if Captain Marie's decision to go to port is to be second-guessed with the benefit of hindsight, it should be leniently judged. And, even if Captain Marie arguably did something wrong in the course of his evasive maneuver—which he did not—the *in extremis* doctrine recognizes that he should not be blamed because the M/V VOYAGER was placed in sudden peril at no fault of its own.

88.     On the day of the collision, none of the VLGC GENESIS RIVER's crew criticized Captain Charpentier's request that Captain Marie go to the greens or suggested that Captain Marie should have done anything differently. (*Id.* 50-51.) At trial, only the Genesis River Interests' paid expert, Captain Breathwit, argued that Captain Marie should have made a different choice. (1 Tr. 128-29.) The Fifth Circuit rejects the second-guessing of the actions of a captain whose vessel is *in extremis. Afran Transp. Co.*, 458 F.2d at 166-67. Indeed, as recognized by Captains Charpentier and Holland, had Captain Marie chosen another option, his crew might have died because the VLGC GENESIS RIVER, both before and after the collision, clearly penetrated the barge lane where the M/V VOYAGER had been transiting. (2 Tr. 78, 84; Charpentier Dep. 99:13-100:7; Holland Dep. 103:1-14.)



(Kirby-34; Kirby-43 at Figure 3; 1 Tr. 131-32.)

89.     Further, Captain Charpentier testified that, if the M/V VOYAGER had maintained her course and speed, the VLGC GENESIS RIVER would have hit the M/V VOYAGER. (2 Tr. 76.) And, had the M/V VOYAGER stopped, there was still a risk for collision. (*Id.*) If the M/V VOYAGER had gone to starboard, she would have been a sitting duck with the tug—not the barges—exposed. (*Id.* 78.) Captain Charpentier recognized that the M/V VOYAGER did nothing to cause the collision. (*Id.* 77-78.)

90.     Captain Holland likewise agreed that the M/V VOYAGER did "[n]othing at all" to cause or contribute to this collision. (*Id.* 84.) When he reached the bridge of

the VLGC GENESIS RIVER minutes before the collision, the VLGC GENESIS RIVER was crossing the Channel, with the M/V VOYAGER dead ahead of the ship. (*Id.* 82-83.) The only viable option was turning to port. (*Id.* 83-84.)

91.    Despite the overwhelming testimony from the experienced mariners involved in the collision, Captain Breathwit opined in four reports that the M/V VOYAGER should have slowed, stopped, or stayed in the barge lane with the possibility of navigating outside of the Channel into an area with known obstructions. (Genesis River-135-137A.) Then, at trial, Captain Breathwit abandoned his theory that the M/V VOYAGER should have gone outside of the barge lane and claimed that the M/V VOYAGER should have either stopped or angled slightly to starboard within the barge lane. (3 Tr. 17, 26, 56-57.)

92.    Captain Breathwit's shifting theories only further highlight that the VLGC GENESIS RIVER placed Captain Marie in an impossible situation and that Captain Marie made the best possible decision. (2 Tr. 249-50.)

### e.  The Genesis River Interests Were Negligent, and the VLGC GENESIS RIVER Was Unseaworthy

93.    The Genesis River Interests denied any responsibility for the collision until trial began. In their opening statement, counsel for the VLGC GENESIS RIVER first "recognize[d] that the GENESIS RIVER does share responsibility in this collision." (1 Tr. 47.) The Genesis River Interests' experts then contradicted their own reports.

94.     Captain Breathwit conceded that the VLGC GENESIS RIVER's loss of control was the first thing that went wrong and that the VLGC GENESIS RIVER created a dangerous situation, supporting the application of the *in extremis* doctrine. (3 Tr. 32, 36.) Additionally, Captain Breathwit acknowledged that Captain Charpentier never regained control of the ship until after the collision, yet never told Captain Marie that he had no control. (*Id*. 47-48.) Further, Captain Breathwit argued at trial, but never in his reports, that Captain Charpentier made the wrong decision in asking Captain Marie to go to the greens. (*Id*. 42, 45.)

95.     Unlike Captain Marie, Captain Breathwit does not hold a designated examiner endorsement, which would allow him to judge the competencies of other wheelmen. (*Id*. 28.) Nevertheless, Captain Breathwit went so far as to say that Captain Marie was completely incompetent, which is simply not credible. (*Id*. 26.)

96.     At trial, Captain Richter testified that the VLGC GENESIS RIVER made several, significant mistakes that contributed to the collision, specifically: (1) excessive speed, (2) lack of trim, and (3) the pilot's loss of situational awareness. On those points, Captain Richter agreed with Captain Cunningham. (1 Tr. 95, 97.) Captain Richter's testimony contradicted his four expert reports, in which he made none of these points and, instead, solely criticized the actions of the M/V VOYAGER and VLGC BW OAK. (Genesis River-138-140A.) Notably, he could not remember what caused him to change his opinions. (3 Tr. 220-21.)

97.     Speed was a major factor in the collision. (4 Tr. 108.) The VLGC GENESIS RIVER's own crew testified that the speed of 12 knots was unsafe, problematic, and should have been avoided. (4 Tr. 146, 148-49, 155.) There is no dispute that the vessel's excessive speed caused it to lose control. (1 Tr. 132.) In addition, the crew did not give Captain Charpentier the additional RPMs he requested, and Captain Charpentier believed that he could have broken the sheer and made the passing arrangement if the crew had given him the additional RPMs. (2 Tr. 74-75, 78.) Captain Richter further testified that Captain Charpentier would have been wise to slow down. (3 Tr. 146-47, 149.)

98.     A fully loaded deep-draft vessel tends to trim by the head, meaning that the bow will go down, making the already sluggish ship even harder to steer and directionally unstable. (1 Tr. 1 97.) The VLGC GENESIS RIVER's speed also caused the vessel to further trim by the head, exacerbating the ship's poor handling characteristics. (4 Tr. 108, 151-52.) Captain Richter testified that the vessel was not properly trimmed and that Captain Charpentier did not have the necessary situational awareness to avoid the collision. (3 Tr. 148-49, 160; 4 Tr. 103.)

99.     The VLGC GENESIS RIVER was also unseaworthy from the moment she left the terminal because her radars and ECDIS were turned off, in violation of U.S. and international law. (4 Tr. 102-105.) The master of the VLGC GENESIS RIVER thought that an operational ECIDS would have helped the crew recognize the sheer

sooner. (Barnes Dep. 47:20-48:14.) After the collision, the Genesis River Interests recognized many of the deficiencies identified by Captain Cunningham in its own navigation guidance document. (Kirby-91; 4 Tr. 154.)

### f.   The Genesis River Interests Were the Sole Cause of the Collision

100.   Under OPA, "each responsible party for a vessel . . . from which oil is discharged . . . is liable for the removal costs and damages . . . that result from such incident." 33 U.S.C. § 2702(a). Responsible parties include the owner, operator, and demise charter of a vessel. 33 U.S.C. § 2701(32)(A). Here, because the reformate spilled from the KIRBY 30015T, Kirby was designated as the responsible party without regard to fault. Kirby cleaned up the spill and paid for all removal costs.

101.   If a third party is the sole cause of the discharge and resulting removal costs and damages, the third party "shall be treated as the responsible party . . . for purposes of determining liability." 33 U.S.C. § 2702(d)(1)(A). Establishing a third party as the sole cause of the spill by a preponderance of the evidence is a complete defense to liability for the initial responsible party. 33 U.S.C. § 2703. At trial, the court received testimony that the collision was caused solely by the Genesis River Interests. (4 Tr. 102.)

102.   To establish that a third party is the sole cause, the responsible party must also establish by a preponderance of the evidence, that it

(A) exercised due care with respect to the oil concerned, taking into consideration the characteristics of the oil and in light of all relevant facts and circumstances; and

(B) took precautions against foreseeable acts or omissions of any such third party and the foreseeable consequences of those acts or omissions[.]

33 U.S.C. § 2703(a)(3)(A)(B).

103.     The M/V VOYAGER was pushing double-hulled barges that were certified by the U.S. Coast Guard to carry Grade A flammable, combustible, and hazardous cargoes. (Kirby-49, 50; *see also* 2 Tr. 131-32.) The Court received voluminous testimony that Captain Marie had situational awareness and took the necessary evasive action, but it was not foreseeable that the VLGC GENESIS RIVER would sheer across the Channel, much less sheer a second time. (2 Tr. 153, 251, 254-55.) Kirby has met its burden of proving that it is entitled to a complete defense under OPA such that the Genesis River Interests shall be treated as the responsible party.

### g.  The Genesis River Interests Are Liable to Kirby

### i.  Kirby Is Entitled to Recover Under OPA

104.     Because the Genesis River Interests were the sole cause of the discharge of oil, the Genesis River Interests, jointly and severally, are treated as the responsible party, become liable under OPA, and are obligated to pay all costs. 33 U.S.C. § 2702(d); *Seaboats Inc. v. Alex C Corp.*, 2003 WL 203078, at *4, 6-7 (D. Mass. Jan. 30, 2003); *In re Setoon Towing*, 859 F.3d 340, 346 (5th Cir. 2017) ("[L]iability will

shift and the other party or parties will become the equivalent of the Responsible Party under the OPA and thus obligated to pay all costs[.]"). Kirby is also entitled to recover all of its removal costs and damages incurred under OPA from the Genesis River Interests by subrogation and contribution. 33 U.S.C. § 2702(d)(1); 33 U.S.C. § 2709.

105.   Under OPA, "[a]ny person . . . who pays compensation pursuant to this Act to any claimant for removal costs or damages shall be subrogated to all rights, claims, and causes of action that the claimant has under any other law." 33 U.S.C. § 2715(a). And "[a] person may bring a civil action for contribution against any other person who is liable or potentially liable under this Act or another law." 33 U.S.C. § 2709; *see also Gabarick v. Laurin Mari. (Am.) Inc.*, 2009 WL 102549, at *2 (E.D. La. Jan. 12, 2009).[1]

106.   Accordingly, Kirby is entitled to recover its removal costs and any damages paid to third parties because of the incident, in addition to its own damages under general maritime law, through subrogation and contribution.

---

[1] The Fifth Circuit has held that contribution is available under OPA, rejecting the argument that OPA merely preserved contribution rights from those liable under other laws. *In re Settoon Towing, LLC*, 859 F.3d at 347-48.

### ii. The VLGC GENESIS RIVER, *in rem*, and the Genesis River Interests, *in personam*, Are Liable Under General Maritime Law

107.   At maritime law, the Genesis River Interests' negligence and the VLGC GENESIS RIVER's unseaworthiness were the proximate cause of the collision and resulting damages.

108.   The presence of a pilot on board does not relieve the watch officers of their duties and obligations with respect to safe navigation of the vessel, and a vessel can be liable *in rem* for the negligence of its pilot. *Charente S.S. Co. v. United States*, 12 F.2d 412, 413 (5th Cir. 1926); *Kingfisher Shipping Co. v. M/V Klarendon*, 651 F. Supp. 204, 207 (S.D. Tex. 1986).[2] Accordingly, Kirby may recover its damages under maritime law from the VLGC GENESIS RIVER, *in rem*, for the negligence of Pilot Charpentier. Further, when a compulsory pilot commits an error and places a vessel in danger, the crew of the vessel has the duty to countermand the pilot, and the shipowner may be held liable, *in personam*, for failure to intervene. *See Kingfisher Shipping Co.*, 651 F. Supp. at 208. Accordingly, the Genesis River Interests are liable, *in personam*.

### iii. The Genesis River Interests Are Liable Under OSPRA and Other State Laws

109.   Kirby may also recover its damages from the Genesis River Interests under the Texas Oil Spill Prevention and Response Act of 1991, Texas Natural

---

[2] At least one court has recognized an *in rem* claim under OPA. *Commonwealth of P.R. v. M/V Emily S*, 1998 WL 938585, at *2 (D.P.R. July 28, 1998) (finding an *in rem* remedy exists at maritime law and under OPA).

Resources Code Chapter 40 ("OSPRA"), and state common law claims of negligence and negligence *per se*.

## IV.   CONCLUSION

As shown at trial, the VLGC GENESIS RIVER was 100% at fault for the collision with the M/V VOYAGER.

Kirby is exonerated from all fault relative to the collision between the VLGC GENESIS RIVER and the M/V VOYAGER.

Kirby was not negligent, the M/V VOYAGER did not violate the Rules of the Road, and the M/V VOYAGER was seaworthy.

The Genesis River Interests were negligent and the VLGC GENESIS RIVER violated the Rules of the Road. Accordingly, the Genesis River Interests' liability is not limited to the gross registered tonnage of the vessel under OPA. Further, the VLGC GENESIS RIVER was unseaworthy.

The discharge of reformate was solely caused by the Genesis River Interests such that the Genesis River Interests shall be treated as the responsible party under OPA.

The Genesis River Interests are liable to Kirby, through subrogation and contribution, for Kirby's own damages, removal costs, and claimants' alleged damages. The VLGC GENESIS RIVER, *in rem*, and the Genesis River Interests, *in personam*, are liable for Kirby's damages at maritime law.

Kirby and the Genesis River Interests will separately submit any disputes regarding the amount of their damage claims to the Court.

The Court will hear evidence of claimants' damages as part of a separate trial or trials.

Respectfully submitted,

SHIPLEY SNELL MONTGOMERY LLP

By:  */s/ George T. Shipley*
George T. Shipley
State Bar No. 18267100
Federal ID No. 02118
712 Main Street, Suite 1400
Houston, Texas 77002
Telephone: (713) 652-5920
Facsimile: (713) 652-3057
gshipley@shipleysnell.com

ATTORNEY-IN-CHARGE FOR
KIRBY INLAND MARINE, LP

OF COUNSEL:

Amy L. Snell
State Bar No. 24002968
Federal ID No. 23039
asnell@shipleysnell.com
Brooksie Bonvillain Boutet
State Bar No. 24097400
Federal ID No. 2789069
bboutet@shipleysnell.com
SHIPLEY SNELL MONTGOMERY LLP
712 Main Street, Suite 1400
Houston, Texas 77002-3201
Telephone: (713) 652-5920
Facsimile: (713) 652-3057

AND

Bijan R. Siahatgar
S.D.T.X. No. 13796
bsiahatgar@clarkhill.com
John K. Spiller
S.D.T.X. 13993
jspiller@clarkhill.com
David James
S.D.T.X. No. 588556
djames@clarkhill.com
Misha Paltiyevich
S.D.T.X. No. 3060542
mpaltiyevich@clarkhill.com
CLARK HILL PLC
909 Fannin Street, Suite 2300
Houston, Texas 77010
T: 713.951-5600
F: 713.951-5660

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document has been served on all counsel of record on March 11, 2021, via eFile.

*/s/ George T. Shipley*
George T. Shipley