**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION**

| | | |
|---|---|---|
| KIRBY INLAND MARINE, LP | § | |
| | § | |
| v. | § | C.A. NO. 3:19-cv-00207 |
| | § | |
| FPG SHIPHOLDING PANAMA 47 S.A., | § | |
| K LINE ENERGY SHIP MANAGEMENT, | § | |
| and the VLGC GENESIS RIVER, *in rem* | § | |

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

| | | |
|---|---|---|
| IN THE MATTER OF KIRBY INLAND | § | |
| MARINE, LP, in a cause for exoneration | § | Rule 9(h) - Admiralty |
| from or limitation of liability | § | |

## POST-TRIAL BRIEF OF THE GENESIS RIVER INTERESTS

Pursuant to the Court's request at the conclusion of the bench trial, the Genesis River Interests submit this post-trial brief explaining (1) what they believe the Court's decision should be; (2) why such a decision should be made; and (3) what evidence supports the decision.

## I.
## OVERVIEW

As stated at the very beginning of trial, the Genesis River Interests accept that they are not blameless for the events that gave rise to the May 10, 2019 collision and spill. Nevertheless, the evidence presented at trial likewise establishes that the negligent conduct of both the BW OAK and the VOYAGER were critical components of the chain of events that ultimately resulted in the unfortunate

casualty.  Specifically, if either the BW OAK or the VOYAGER had acted differently and taken proper action on the date of the incident, this collision would not have occurred.

First, the BW OAK met the GENESIS RIVER in the vicinity of a notoriously problematic stretch of the Houston Ship Channel, namely near the bend at the Bayport Flare.  Although the channel had been widened in that area to effectively create a wider inbound lane (which was commonly used by similarly sized inbound vessels), the BW OAK elected not to use the widener during the meeting with the GENESIS RIVER.  To make matters worse, the BW OAK – in clear violation of Rule 9 of the Inland Rules of the Road – crossed the centerline of the channel into the GENESIS RIVER's outbound lane in order to execute a wide turn at the bend right before the BW OAK's meeting with the GENESIS RIVER.  The BW OAK's actions forced the GENESIS RIVER to proceed along the very outer edge of the outbound channel, removing any margin for error and exposing the GENESIS RIVER to shoaling and adverse hydrodynamic effects, which were obviously encountered by the GENESIS RIVER, resulting in her loss of positive navigational control, and set off the succession of events that culminated with the collision and subsequent spill.

Second, although the VOYAGER does not enter the equation until later, Capt. Marie's lack of situational awareness and poor decisions ultimately put the

VOYAGER directly in harm's way and sealed its fate.  The video evidence in this case clearly shows that Capt. Marie was actively and continuously distracted by his mobile phone for >22 minutes before the GENESIS RIVER first radioed the VOYAGER.  While Capt. Marie's first reaction upon being initially contacted by the GENESIS RIVER was to (correctly) idle his engines, seconds later he immediately and robotically accepted the GENESIS RIVER's pilot's instruction to "go to the greens" and to effectively leave the protected shallow depths of the barge lane and cross the main channel ahead of the rapidly-closing GENESIS RIVER.  Tellingly, while the VOYAGER's expert, Capt. Cunningham, goes into excruciating detail to hypothesize and diagram where the VOYAGER and the GENESIS RIVER would have potentially made contact if the VOYAGER had simply proceeded up the barge lane and been in a position to meet the GENESIS RIVER where she briefly entered and exited the barge lane, the VOYAGER's expert made no attempt to meaningfully assess what would have happened if Capt. Marie had simply followed through on his initial reaction to stop his tow (which, according to multiple accounts, including Capt. Marie's own testimony, would have been accomplished in roughly two tow-lengths).  *See* Trial Transcript, Day 3, p. 17:14-18. Accounting for the two-tow stopping distance, a simple view of where the VOYAGER would have stopped had Capt. Marie followed through on his initial instinct clearly shows that stopping in the safer much shallower depths of the barge lane was the VOYAGER's best option,

and collision would have been avoided – a far better situation than the best-case scenario of a possible 20-40 foot miss that Kirby's expert postulated at trial with respect to the VOYAGER's attempt to enter the main channel and cross to the green side ahead of the GENESIS RIVER.



This image utilizes Genesis River Exhibit 37. The image: (1) adds two tow-lengths to the VOYAGER's position at 15:13:17 (i.e., where the Voyager was located when Capt. Charpentier first radioed VOYAGER) to show where the tow would have stopped; and (2) compares the two-tow stopping point against the GENESIS RIVER's position at 15:16:08 (i.e., where the GENESIS RIVER was located at the time of collision).

This image illustrates a separation of over an entire tow-length (i.e., over 365 feet). This does not even account for the fact that the VOYAGER tow likely would have started to travel in reverse and extend the distance even more. It also does not account for the fact that the VOYAGER could have created even greater separation by proceeding to the outer edge of the barge lane.

Simply put, if Capt. Marie had gone with his apparent initial instinct, and also as required by Rule 8(e), to stop the VOYAGER in the confined waters of the barge lane, the collision would not have happened.  Instead, and likely due to his apparent inattention and in violation of Rule 5 (Lookout), taken together with his lack of situational awareness over the preceding 22 minutes, Capt. Marie mindlessly acquiesced to the pilot's uninformed suggestion that he take his 366-foot tow out of the confined waters of the barge lane and attempt to "go to the greens" ahead of the rapidly closing GENESIS RIVER, without really assessing whether the loaded VOYAGER tow had the ability to successfully complete the maneuver.

Finally, as stated above, the Genesis River Interests recognize that the GENESIS RIVER is not blameless.  The Genesis River Interests do not disagree with the Pilot Board Investigation and Recommendation Committee's findings that Pilot Charpentier briefly lost situational awareness which impacted his ability to consider all options to avoid a collision.  However, the above-described conduct of the BW OAK and the VOYAGER are critical components of the overall negligence that produced the May 10, 2019 collision.  Without them, this accident would not have occurred.

**II.**
**THE BW OAK'S NEGLIGENCE**

**A.      The GENESIS RIVER and the BW OAK**

The GENESIS RIVER and the BW OAK are Very Large Gas Carrier (VLGC) vessels of fairly similar measurements (as summarized in the tables below).

Importantly, on May 10, 2019, the GENESIS RIVER was loaded with LPG cargo and the BW OAK was empty (in ballast).  Thus, the most prominent difference between the measurements of the two vessels on May 10, 2019 was the fact that the BW OAK's draft (vertical distance between the waterline and bottom of the vessel's hull) was about 11 feet shallower than the GENESIS RIVER.

*GENESIS RIVER*

| Length | 755 feet |
|---|---|
| Beam (vessel width at widest point) | 122 feet |
| **Draft at time of incident** | **37 feet** |

*BW OAK*



| Length | 740 feet |
|---|---|
| Beam | 120 feet |
| **Draft at the time of incident** | **26 feet** |

## B.     The Houston Ship Channel

The Houston Ship Channel consists of a 530-foot-wide, deep-draft main channel that is flanked on each side by a 35-foot-wide transition slope that connects to a 200-foot-wide barge lane with a project depth of 12 feet.  The below graphic further describes these features.  The green (outbound side) and red (inbound side) markers identify the respective outer edges of the barge lanes.



## C.  The Bayport Flare and the HSC Bend

The inbound BW OAK met the outbound GENESIS RIVER in the vicinity of the Bayport Flare very near the HSC Bend, a highly trafficked area near the intersection between the Houston Ship Channel and the Bayport Channel.  As identified by a March 2016 US Army Corps of Engineers study, this portion of the Houston Ship Channel is an "Area of Safety Concern" (*see* Genesis River Exhibit 167, page 53):



The Corps of Engineers report noted the significant number of casualties that have occurred in this area (*see* Genesis River Exhibit 167, p. 55):



The Corps of Engineers report goes on to state that, with respect to the HSC Bend, "the incidence of bank excursions increases by 67% to 70% in the area of concern, compared with bank excursions in the straight reaches of the channel leading to the bend." (*See* Genesis River Exhibit 167, p. 9).

## D.     The Widener at the Bayport Flare

In response to the safety issues associated with the above-described "Area of Safety Concern" at the HSC Bend and Bayport Flare, a widener was installed to help facilitate safer meetings between vessels in the area.

The below close-up screenshot from the BW OAK pilot's Personal Pilot Unit (PPU) at 15:10:35 shows the BW OAK's and the GENESIS RIVER's respective

positions shortly before they met.[1]  The white-striped area indicates suitable water depths for ship traffic, and the green line marks the centerline of the main channel. The two orange arrows were added to the screenshot to the "widener" that provides an additional width of suitable water depth for inbound vessel traffic.



---

[1] Genesis River Exhibit 14.

The below May 2019 hydrostatic survey taken a few days after the collision demonstrates the deep-water depths within – and well outside – the widener.  The water depth was well over 40 feet – even outside Marker 76.[2]



Moreover, an analysis of contemporaneous vessel meetings in the area (conducted by the BW Oak Interests' own expert) demonstrates that the widener was commonly used for vessel meetings.  The below screenshots demonstrate just some

---

[2] *See* Genesis River Exhibit 146.  According to testimony from the BW Oak Interests' own expert, Capt. Michael Lawson (a retired Houston pilot), it is a common and reasonable practice for the Houston Pilots to keep apprised of the hydrographic surveys of Houston Ship Channel periodically conducted by the U.S. Army Corps of Engineers.  *See* Transcript of Deposition of Capt. Michael Lawson, p. 37:7-16.

of many examples[3] of similar meetings where the inbound vessel did not cross the centerline of the main channel in preparation of the turn at the HSC Bend but, instead, initiated its turn from its own side of the main channel <u>and</u> used the widener to afford the outbound vessel sufficient separation.  During his testimony at trial, Capt. Barton acknowledged twelve (12) such meetings between similarly-sized vessels in the same general vicinity, during the months of April/May 2019 whereby in each and every instance the inbound vessel initiated her turn from her side (i.e. red side) of the main channel <u>and</u> used the widener[4]:

---

[3] The BW Oak Interests have not – and cannot – refute the impact of these examples.  At the summary judgment stage, they tried to argue (incorrectly) that all the meetings were south of the BW OAK-GENESIS RIVER meeting location (*see*, *e.g.*, the PHILADELPHIA EXPRESS-CRANE ISLAND meeting, #12 below, which was north of the BW OAK-GENESIS RIVER meeting).  At trial, they once again (incorrectly) attempted to suggest that these examples involved inbound vessels turning into the Bayport Channel – none of the 12 examples below involve vessels turning into the Bayport Channel.

[4] *See* Genesis River Exhibit 164.

## (1) CL ALICE/UBC STOCKHOLM





## (2) CAPE BRASILIA/DIAMOND LAND





## (3) ASOPOS/SILVER MANOORA





## (4) SUMAQ QUEEN/SANSOVINO





## (5) BOW SUN/SONGA FORTUNE





# (6) STOLT INNOVATION/LUCIA





## (7) HIGH PROSPERITY/GRAZIA





## (8) BLUE FIN/COSCO JEDDAH



## (9) JENNY N/CLIPPER MOON





## (10) INDEPENDENCE/AS CLEOPATRA





## (11) RIO BLACKWATER/AEGEAN SPIRE



## (12) PHILADELPHIA EXPRESS/CRANE ISLAND





As demonstrated by the above examples, if the inbound vessel (e.g., BW OAK) does not cross the centerline of the main channel and uses the widener, as she should have particularly taking into account her much shallower draft, the outbound vessel (e.g., GENESIS RIVER) can navigate closer to the centerline of the channel on its side, avoid exposure to adverse hydrodynamic interactions with the bank of the main channel, and initiate its turn earlier.

Capt. Barton, the pilot at the conn of the BW OAK, testified that he elected not to have the BW OAK enter the widener because it would have been "uncomfortable"[5] and due to his own concerns regarding shoaling and a potential sheer to be encountered by the BW OAK[6] – which, as noted above, was in ballast and drawing only 26 feet (or about 11 feet less than the GENESIS RIVER).  It should be strongly emphasized that nothing in Rule 9 speaks of "comfort" levels when navigating a Narrow Channel, but instead Rule 9 dictates that a vessel "shall keep as near to the outer limit of the channel or fairway which lies on her starboard side as

---

[5] Capt. Barton explained "uncomfortable" as follows (*see* Trial Transcript, Day 4, p. 40:17-19):

> **Q.**   Uncomfortable how?
>
> **A.**   Uncomfortable because my ship would have been pointed at his ship throughout the whole meeting process.

A simple review of the area in question and the above 12 examples of similar meetings wherein the widener was used by the inbound vessel (and the vessels were not pointed at one another) establish that Capt. Barton's explanation of "uncomfortable" is unfounded.

[6] *See* Trial Transcript, Day 4, p. 25:7-10.

is safe and practicable."[7]   The BW OAK had ample room and depth to stay considerably further to her starboard.   The shallower draft of the BW OAK in conjunction with the above-cited examples of previous meetings in the widener and the April 2019 dredging of the widener demonstrate that such concerns were unfounded.[8]



<hr/>

[7] "A vessel proceeding along the course of a narrow channel or fairway shall keep as near to the outer limit of the channel or fairway which lies on her starboard side as is safe and practicable." 33 C.F.R. § 83.09.

[8] *See* Genesis River Exhibit 147, p. 9 (April 2019 hydrostatic survey showing dredge operations at the widener); *see also* Genesis River Exhibit 148, p. 9 (January 2019 hydrostatic survey showing water depths of 46+ feet within and even outside the outer edge of the widener).

As displayed in the above PPU screenshot, the outbound GENESIS RIVER and the inbound BW OAK are *both* positioned on the green (outbound side) of the main channel.  The "L 49 ft" in the bottom left corner of the screenshot indicates that the center of the BW OAK was 49 feet to the left of the centerline of the main channel.  Thus, up to 109 feet of the BW OAK's overall 120-foot width was positioned in the outbound side of the main channel at that time – only about one minute before the vessels met.

Capt. Barton also testified that, had the BW OAK not met the GENESIS RIVER where she did on May 10, 2019, the GENESIS RIVER would have been able to remain close to the centerline of the main channel.[9]  The only reason why the GENESIS RIVER was on the green side edge of the main channel was because the GENESIS RIVER was meeting the BW OAK at the particular time and location where they met on May 10, 2019.  Capt. Barton further testified that, had the GENESIS RIVER been able to stay at the centerline of the main channel, Capt. Barton believed that the GENESIS RIVER would not have lost positive control on May 10, 2019:

> **Q.**   I believe you previously testified that if the BW OAK had not been there and the GENESIS RIVER had been able to use the centerline, he would have been fine, there would have been no loss of control of navigation, correct?

---

[9] *See* Trial Transcript, Day 4, p. 51:7-13.

**A.** I'm sure he would have had no issues at all.[10]

As demonstrated in the below succession of screenshots from the BW OAK PPU, the BW OAK's wide turn that was initiated from the outbound side of the main channel forced the GENESIS RIVER to proceed to the extreme edge of the outbound side of the main channel positioning the GENESIS RIVER closely against the bank of the main channel, exposing the GENESIS RIVER to adverse hydrodynamic interactions with the bank of the main channel.



---

[10] *See* Trial Transcript, Day 4, p. 48:13-17.















**D.    The BW OAK's improper wide turn from the outbound (green) side of the main channel embarrassed the GENESIS RIVER's navigation and precipitated her fateful turn to port across the main channel.**

As is readily apparent in the above-referenced PPU screenshots, testimony, and survey materials, the BW OAK–GENESIS RIVER meeting was certainly not "textbook" as the conning pilots of the GENESIS RIVER and BW OAK would like this Court to believe.  In fact, the meeting between the BW OAK and the GENESIS RIVER looks nothing like the "textbook" example the BW OAK Interests utilized during the course of the trial.  Compare the "textbook" meeting in a straightaway portion of the channel against the BW OAK's wide approach from the wrong side of the channel at a bend in an portion of the channel known as an "Area of Safety Concern" (despite the availability of a commonly-used widener designed and utilized to avoid this situation):

## "Textbook"[11]



## *May 10, 2019*[12]



---

[11] *See* BW Exhibit 76.

[12] The BW OAK's expert, Capt. Highfield, testified that he found no textbook displaying a vessel meeting at a bend/elbow like the BW OAK-GENESIS RIVER meeting on May 10, 2019. *See* Trial Transcript, Day 4, p. 114:13-15. Capt. Highfield further confirmed that he has not produced any examples of any other meetings at/near the HSC Bend wherein the inbound vessel initiated its turn at a point across the centerline and in the outbound side of the channel. *See id.*, p. 113:8-12.

The BW OAK's improper wide turn initiated from across the channel's centerline impaired the safe navigation of the GENESIS RIVER and precipitated her fateful turn to port across the channel and her loss of positive navigational control that ultimately resulted in the GENESIS RIVER's collision with the VOYAGER Tow.  Capt. Richter, the Genesis River Interests' pilotage and navigational expert, rightfully criticizes the BW OAK for its failure to utilize the widener as many other vessels did during that same period, or to, at the very least, give the GENESIS RIVER adequate room during the meeting.  Instead, the BW OAK's actions forced the GENESIS RIVER to the extreme starboard edge of her own side of the channel, causing her to turn late as well.

**E.     The BW OAK's negligence and violation of Rule 9 make it clear that the BW OAK bears significant responsibility for this accident.**

To prevail on their maritime negligence claim, the Genesis River Interests must prove that (1) the BW Oak Interests owed a duty to the plaintiff, (2) the BW Oak Interests breached that duty, (3) the breach actually and proximately caused the Genesis River Interests' injury, and (4) the Genesis River Interests sustained an injury.  *Franza v. Royal Caribbean Cruises, Ltd.*, 772 F.3d 1225, 1253 (11th Cir. 2014); *In re Great Lakes Dredge & Dock Co.*, 624 F.3d 201, 211 (5th Cir. 2010).  In determining the scope of the duty owed in a maritime negligence claim, the Fifth Circuit has held that courts must consider the foreseeability of the harm suffered by the complaining party, such that a "[d]uty may be owed only with respect to the

interest that is foreseeably jeopardized by the negligent conduct." *In re Great Lakes Dredge*, 624 F.3d at 211 (quotations marks and citation omitted).  In other words, a duty is owed "if harm of a general sort to persons of a general class might have been anticipated by a reasonably thoughtful person, as a probable result of the act or omission, considering the interplay of natural forces and likely human intervention." *Id.* (quotation and citation omitted).

The standard of care, or duty, is a question of law that is established by statutes, rules, regulations, maritime custom, or general principles of negligence law. *S.C. Loveland, Inc. v. East West Towing, Inc.*, 608 F.2d 160, 165 (5th Cir. 1979) (citing *Pennsylvania R.R. Co. v. S.S. Marie Leonhardt*, 202 F. Supp. 368, 375 (E.D. Pa. 1962)); *see also Targa Midstream Servs. Ltd. P'ship v. K-Sea Transp. Partners, L.P.*, 527 F. Supp. 2d 598 (S.D. Tex. 2007). [13]  The standard of care in maritime negligence cases is "reasonable care under existing circumstances." *Coumou v. United States*, 107 F.3d 290, 295-96 (5th Cir. 1997).  However, negligence *per se* applies when a statute or regulation "establishes a clear minimum standard of

---

[13] The standard of care against which fault is determined is derived from (1) general concepts of prudent seamanship and reasonable care; (2) statutory and regulatory rules governing the movement and management of vessels; and (3) recognized customs and usages.  2 Admiralty & Mar. Law § 14:3 (6th ed.).  The Inland Navigation Rules and common law principles of admiralty law require prudent seamanship and the exercise of reasonable care in the navigation of a seagoing vessel.  *Williamson Leasing Company v. Am. Commercial Lines, Inc.*, 616 F.Supp. 1330, 1338 (E.D. La. 1985).  Violation of the rules of navigation or default in the exercise of prudent seamanship constitute negligence and impose liability on the guilty party, just as is the case in a common law negligence action. *Diesel Tanker Ira S. Bushey, Inc. v. Tug Bruce A. McAllister*, 1994 WL 320328, at *6–7 (S.D.N.Y. 1994).

care" and replaces the general standard of care.  *Dougherty v. Santa Fe Marine, Inc.*, 698 F.2d 232, 234-35 (5th Cir. 1983).

Additionally, the *Pennsylvania* Rule instructs that a party who violates a statutory rule intended to prevent maritime accidents is presumed to have caused the accident.  *See Pennzoil Producing Co. v. Offshore Express, Inc.*, 943 F.2d 1465, 1472 (5th Cir. 1991); *see also Candies Towing Co. v. M/V B & C Eserman*, 673 F.2d 91, 93 (5th Cir. 1982) (the *Pennsylvania* Rule "constitutes an evidentiary rule reversing the burden of proof").  "In such a case the burden rests upon the ship of showing not merely that her fault might not have been one of the causes, or that it probably was not, but that it could not have been."  *The Pennsylvania*, 86 U.S. 125, 136, 19 Wall. 125, 22 L.Ed. 148 (1874).

The Inland Navigation Rules apply to the portion of the Houston Ship Channel where the accident occurred and are intended to prevent maritime casualties.[14]  33 C.F.R. § 83.01, *et seq.*  Rule 9 of the Inland Navigation Rules prescribes a course of conduct in narrow waterways to avoid collision, and Rule 9(a)(i) specifically provides as follows:

> A vessel proceeding along the course of a narrow channel or fairway shall keep as near to the outer limit of the channel or fairway which lies on her starboard side as is safe and practicable.[15]

---

[14] The Houston Ship Channel is a "narrow channel" within the meaning of Rule 9. *Maya Special Mar. Enter. v. Crochet*, 2016 WL 4190153, at *12 (S.D. Tex. Aug. 9, 2016) (Ellison, J.).

[15] *See* 33 C.F.R. § 83.09.

Violation of the principles of Rule 9, also known as the "Narrow Channel Rule," is considered to be "a most serious statutory fault." *The Standella*, 108 F.2d 619, 620 (5th Cir.1939); *see also The Newport News*, 105 F. at 393 (describing duty to steer to starboard side as "a cardinal rule"). Accordingly, it should come as no surprise that "[c]ourts have rigidly enforced this rule as an important safety regulation." *Moran Scow Corp.*, 342 F.Supp. at 238.

At its core, the Narrow Channel Rule reflects the expectations of those that transit narrow channels. *See Penrod Drilling Co. v. Inland Oil & Transp. Co.*, 561 F.Supp. 810, 815 (E.D. La. 1983) ("Presumptively, it is safe and practicable to navigate on the starboard side of the channel."). Because of this widely-held expectation, "[i]t has been stated that a vessel which proceeds on the wrong side of the channel must take at least to some extent, the risk of subsequent events". *Moore-McCormack Lines, Inc. v. S.S. Portmar*, 249 F.Supp. 464, 469-70 (S.D.N.Y. 1966) (citing *Det Forenede Dampskibs-Selskab, A/S v. The Excalibur*, 216 F.2d 84, 85 (2d Cir. 1954). In order to violate Rule 9, a vessel does not need to be all the way over on the wrong side of a channel – merely crossing the centerline may be sufficient. *See In re Luhr Bros., Inc.*, 325 F.3d 681, 687 (5th Cir. 2003) (affirming trial court's determination that vessel "was in clear violation of Rule 9(a)(i) because it was sixty to seventy feet 'across the centerline of the channel.'"); *W. Pac. Fisheries, Inc. v. SS President Grant*, 730 F.2d 1280, 1286 (9th Cir. 1984) (noting that vessel violated

rule when she "proceeded too close to the center line and then crossed over into the outbound lane" (omitting internal quotations)).

As with other violations of the Inland Navigation Rules, a violation of Rule 9 shifts to the offending vessel the heavy burden of showing that its fault could not have contributed to the collision. *See Penrod Drilling*, 561 F.Supp. at 815 ("The burden of proof is on the vessel found on the wrong side of the channel to show not merely that her fault might not have been one of the causes of the accident, **but that such violation could not have contributed to the collision**.") (emphasis added).

The BW OAK clearly violated Rule 9(a) by not keeping to the outer limit of the channel which lies on her starboard as is safe and practicable, thereby embarrassing the navigation of the GENESIS RIVER and resulting in increased hydrodynamic forces that overwhelmed the ability of the GENESIS RIVER to overcome, causing the GENESIS RIVER to lose positive navigational control. Moreover, it is abundantly clear that the BW OAK's violation of Rule 9 was a critical factor that precipitated the entire succession of unfortunate events that culminated with the collision and spill. There is simply no way that the BW Oak Interests can credibly claim that the BW OAK and its actions in violation of Rule 9 could not have contributed to this collision. The evidence to the contrary is overwhelming.

# III.
# VOYAGER'S NEGLIGENCE

**A.    The Voyager Tow**





| Length | ~366 feet (barges 297.5 feet and tugboat 68.9 feet) |
|---|---|
| Beam (vessel width at widest point) | 108 feet |
| Draft at time of incident | 10 feet |

**B.** **Capt. Marie's >22-Minute Personal Cell Phone Usage and Lack of Situational Awareness**

The Genesis River Interests appreciate that Capt. Marie encountered a difficult situation on May 10, 2019 when Capt. Charpentier first radioed the VOYAGER to advise that the GENESIS RIVER was having difficulty checking up. However, due to his own conduct prior to the call, he was simply in no position to properly access the situation and take proper responsive action. At trial, Capt. Marie testified that he was engaged and not distracted by – or even using – his personal phone prior to the call from Capt. Charpentier:

> Q. So just to jump a little ahead here, on the day of the incident, before you were contacted by the pilot of the GENESIS RIVER, you were, in fact, on your cell phone doing calculations to see if you could afford to buy a truck, which we now know was for your wife, correct?
>
> A. I had it sitting on my lap, yes, sir.
>
> Q. Well, were you using it or not?
>
> A. I can't recall. I don't believe I was. I just had it -- I mean, earlier that day, I was messing with the calculator. But normally when I'm driving, I have it setting on my leg. But I don't believe I was using it.
>
> Q. So you previously testified that you were doing, you know, calculations. Do I need to read you that testimony? Because I'm sensing that there might be a little change here.
>
> A. No. You don't need to read it to me. No, sir. Thank you. I had it set on my leg. I'm right-handed. I don't text or anything with this thumb here. **I had my hand on the stick the entire time prior to the call.**

Q.     And you did not put the phone down until the call came in, correct?

A.     Yes. I may have grabbed it off my lap and threw it on the dash so I could set up.

Q.     And you were holding it and/or using it for about 20 minutes before that call came in, correct –

A.     I can't –

Q.     -- if we watch the security video?

A.     -- I can't tell you if I was or not. I don't believe I was, but I may have.

Q.     I'm sorry.  You use them to calculate distances.  Does that mean you could also use them to calculate tides?

A.     Tides?

Q.     Tidal information.

A.     A calculator?  No, sir.

Q.     I mean your phone.

A.     My phone?  If I look it up on the internet, yes, I could; but I don't play on the internet while I'm on my phone.

Q.     And are you aware that using your phone while you are standing watch is a violation of Kirby policy?

A.     Yes, I do.[16]

---

[16] *See* Trial Transcript, Day 2, pp. 178:16-180:14.

As Capt. Marie freely admitted at trial, use of a personal phone in the wheelhouse is a blatant violation of Kirby's own safety policies (*see* Genesis River Exhibit 23):

| KIM | VESSEL OPERATING PROCEDURE MANUAL | EXHIBIT |
|---|---|---|
| C3.035 | **Wheelhouse Standing Orders** | **23** |

**All Officers of the Watch (OOW) are responsible for complying with the following standing orders. The Master may supplement these standing orders. IF AT ANY TIME YOU ARE IN DOUBT CALL THE MASTER.**

1. Follow all company policies and procedures. Adhere to all regulatory requirements and Navigation Rules.

2. OOW must be in the wheelhouse at all times while underway.

3. No personal cell phone use or other duty distracters are permitted in the wheelhouse while the vessel is underway.

4. Maintain a proper radio watch. Monitor Ch. 16 or applicable VTS channel as well as appropriate bridge to bridge channel for area of operation when underway. Monitor appropriate working channel for facility or fleet while standing by.

5. While underway maintain a minimum Under Keel Clearance (UKC) of one foot (1').

6. Do not begin a voyage from a dock or fleet if visibility in present location is less than 0.5 nautical miles (nm).
   a. In the event of a short transit, i.e. intra-harbor shift to a fleet or dock, the vessel may proceed if it is deemed prudent by the Master. The OOW shall notify the Operations Department and gain approval prior to proceeding.

7. Closely monitor the weather for changes to operating conditions during the voyage.

8. Maintain a proper Lookout.

However, as demonstrated by the below screenshots from the VOYAGER wheelhouse, over the course of the preceding 22+ minutes, it is clear that Capt. Marie's attention was in fact consumed by his phone.[17]  It was not sitting on his lap.

---

[17] *See* Genesis River Exhibit 38D.  At trial, Kirby took note of the fact that the Genesis River Interests' experts' reports did not mention Capt. Marie's phone usage.  However, the Genesis River Interests did not receive a copy of the wheelhouse video footage until late-October 2020, following the expiration of the expert report deadlines.  The Genesis River Interests are not sure why these materials were not received prior to that time, and, as stated at trial, the Genesis River Interests do

He was constantly using his mobile phone with his right hand, left hand – and both hands – over this >22-minute period, and it is clear that he certainly did not have "his hand on the stick the entire time before the call" as he testified.  Capt. Marie's attempts to minimize the duration and extent of his phone usage prior to the collision are not credible, as his statements are highly inconsistent with the available video footage:



not mean to suggest that Kirby had any negative intentions with respect to the production of these materials.





The phone and Capt. Marie's hands/fingers using the phone are visible throughout the over-22-minute period.





Capt. Marie's feet are perched here for nearly the entirety of the 22+ minutes.

The phone never appears to be simply resting on Capt. Marie's lap.

















































1) After over 22 minutes of constant, active phone usage with his feet comfortably propped up on the ledge of the wheelhouse, Capt. Marie answers the first call from the GENESIS RIVER.

2) Capt. Charpentier tells VOYAGER to "go to the greens" about 20 seconds later.

3) Capt. Marie immediately complies .

4) Collision occurs about 2 1/2 minutes later.



Kirby will inevitably argue that Capt. Marie was in an "*in extremis*" situation, and, thus, he should not be criticized for making what was not the best responsive decision. However, the party relying on the *in extremis* doctrine must be completely free from fault prior to the emergency occurrence. *Puerto Rico Ports Authority v. M/V Manhattan Prince*, 897 F.2d 1, 6 (1st Cir. 1990). "It does not excuse a vessel making a wrong maneuver *in extremis* where the imminence of the peril was occasioned by the fault or negligence of those in charge of the vessel, or might have been avoided by earlier precautions which it was bound to take." 70 Am.Jur.2d Shipping § 619 (2003). Further, applicability of the doctrine does not prevent a finding of liability, it merely requires courts to judge a captain's reactions more leniently because of the crisis situation. *Grosse Ile Bridge Co. v. American Steamship Co.*, 302 F.3d 616, 625-26 (6th Cir. 2002).[18]

---

[18] The *in extremis* doctrine is typically applied to excuse errors in judgment committed in the short interval just before a collision or allision – in other words, when an emergency suddenly arises and

Capt. Marie's constant and heavily involved usage of his personal cell phone, in violation of Kirby's policy, over the course of the 22-minute period preceding the first call from Capt. Charpentier clearly demonstrates that he was not properly paying attention to his surroundings in addition to being a violation of Rule 5, (Lookout), which dictates: "Every vessel shall at all times maintain a proper look-out by sight and hearing as well as by all available means appropriate in the prevailing circumstances and conditions so as to make a full appraisal of the situation and of the risk of collision."[19]  This incident unfolded and resulted in the collision just over 3 minutes after the first call.  And, as Capt. Marie was distracted over an exponentially longer period of time, he was simply not aware of his surroundings and prepared to make his own assessment as to how to respond to the developing situation.  Instead, he robotically adhered to the suggestion of a pilot who himself was found to have lost situational awareness during the incident.

The following screenshots further demonstrate the cursory nature of Capt. Marie's responses after he was roused from his 22+ minutes of personal phone usage:

---

a peril is imminent.  *See*, e.g, *Crescent Towing & Salvage Co. v. M/V CHIOS BEAUTY*, 610 F.3d 263, 268 (5th Cir. 2010); *Boudoin v. J. Ray McDermott & Co.*, 281 F.2d 81, 84-86 (5th Cir. 1960).

[19] *See* 33 C.F.R. § 83.05.



05-10-2019 Fri 15:05:47 (S)

Capt. Marie begins to put his phone down to answer Capt. Charpentier's first call

wheelhouse



05-10-2019 Fri 15:05:54 (S)

Capt. Charpentier says "keep an eye on me"

wheelhouse







Not surprisingly, given the clear video evidence from the VOYAGER's wheelhouse, even Kirby's initial accident report to the U.S. Coast Guard (*see* Genesis River Exhibit 32) states that Capt. Marie simply complied with Capt. Charpentier's instruction to go to the greens (and does not include Kirby's later revisionist history of Capt. Marie being a captain at full attention at all times who completed a situationally-aware evaluation of his options prior to accepting Capt. Charpentier's instruction to "go to the greens"):

DEPARTMENT OF HOMELAND SECURITY
U.S. Coast Guard

OMB No: 1625-0001
Exp. Date: 03/31/2019

**REPORT of MARINE CASUALTY, COMMERCIAL DIVING CASUALTY, or OCS-RELATED CASUALTY**

Section I - Reporting Vessel/Facility Information

| 1. Vessel or Facility Name | 2. Vessel Official Number or IMO Number | 3. Vessel Flag |
|---|---|---|
| VOYAGER | 563475 | USA |

| 4. Vessel Length | 5. Vessel Gross Tons | 6. Vessel Propulsion Type |
|---|---|---|
| 68.9  [x] Feet [ ] Meters | 155 | DIESEL |

| 7. Vessel or Facility Type | 8. Vessel or Facility Service or Occupation |
|---|---|
| TOWING | VOYAGER |

25b.  Description of the Casualty (casualty events and the conditions and actions that were believed to be causal factors as well as any hazards created as a result of the casualty.  Attach additional sheets if necessary.):

WHILE INBOUND THE HOUSTON SHIP CHANNEL NEAR BEACON 73-74 MEETING THE OUTBOUND LPGC GENESIS RIVER, THE M/V VOYAGER RECEIVED CALLS FROM THE PILOT ABOARD THE LPGC GENESIS RIVER REPORTING ISSUES CONTROLLING THE VESSEL AND INSTRUCTING THE M/V VOYAGER TO ALTER ITS COURSE TO THE PORT TO AVOID A COLLISION. THE M/V VOYAGER WAS ON THE RED SIDE OF THE CHANNEL AT THIS TIME AND THE LPGC GENESIS RIVER APPEARED TO BE ALTERING ITS COURSE TO THE PORT AND MOVING FROM THE GREEN SIDE TO THE RED SIDE OF THE CHANNEL. THE M/V VOYAGER COMPLIED WITH THE PILOT'S INSTRUCTION IN AN EFFORT TO AVOID COLLISION. THE M/V VOYAGER SOUNDED ITS GENERAL ALARM AND THE CREW MUSTERED PRIOR TO THE COLLISION. THE M/V VOYAGER SOUNDED THE DANGER SIGNAL OF FIVE SHORT AND RAPID BLASTS PRIOR TO LPGC GENESIS RIVER STRIKING THE TANK BARGE KIRBY 30015T. THE BOW OF THE LPGC GENESIS RIVER COLLIDED WITH THE TANK BARGE KIRBY 30015T, HOLING THE NO. 2 CARGO TANKS. THE TANK BARGE MMI 3041 WAS CAPSIZED AS A RESULT OF THE COLLISION. M/V VOYAGER IMMEDIATELY COMMENCED THE NECESSARY RESPONSE ACTIVITIES AND NOTIFICATIONS.

As further evidence of Capt. Marie's robotic reaction, it is clear that he did not properly assess his tow's ability to complete his agreement to go to the green side of the channel (i.e., now a starboard-to-starboard meeting with the GENESIS RIVER) because, at the time of collision, the VOYAGER was still mostly on the red side of the Channel.  During trial and in response to a question about what "going to the greens" meant to Capt. Marie, he agreed that his deposition testimony was accurate, which was as follows:

> QUESTION: And just to be clear, Tony, 'going to the greens,' you understood it that the stern, if I can put it like that, of the VOYAGER would be clear on the green side of the channel across the centerline, correct?

ANSWER: Yes.[20]

Clearly, Capt. Marie did not adhere to his obligations of the starboard-to-starboard agreement, as he failed to get the stern of the VOYAGER anywhere close to the centerline of the main channel.

In short, Capt. Marie, without properly assessing the situation and with full knowledge that his tow would lose considerable speed the moment he turned to port (as it did), failed to carry out his part of the agreement to go to the greens and the VOYAGER was still pretty much in the middle of the red side of the channel at the time of collision, with the tug's stern barely out of the barge lane.

Additionally, even though Capt. Marie expressed concerns that, if he had simply stopped the VOYAGER, he might have been overrun by the tow PROVIDER (which was about one-half mile astern), he never even took a few seconds to contact the PROVIDER, and admitted during his testimony that he should have.[21]

Kirby's own policies rightfully prohibit the personal use of cell phones in order to avoid distractions.[22]  Not surprisingly, other courts have previously found that a navigating mariner's use of a cell phone can be negligent conduct.  *Holzhauer*

---

[20] *See* Trial Transcript, Day 2, p. 192:14-18.  Capt. Marie later confirmed to the Court that this was his deposition testimony:  THE COURT: Captain, do you acknowledge that the part of the deposition that Mr. Georgantas read to you was the accurate testimony from that part of the deposition inspite of what may have come before it?  THE WITNESS: It was an accurate testimony, yes.  *See id*, p. 194:16-20.

[21] *See* Trial Transcript, Day 2, p. 206:10-13.

[22] *See* Genesis River Exhibit 23.

*v. Golden Gate Bridge Highway & Transp. Dist.*, 13-CV-02862-JST, 2016 WL 7242108, at *3 (N.D. Cal. Dec. 15, 2016), aff'd, 745 Fed. Appx. 265 (9th Cir. 2018) ("Expert witness Captain Katherine Sweeney testified that it was not safe for Captain Shonk to use his cell phone and that she had never used her cell phone on the bridge. She further testified that it would never be safe for the person serving as a lookout to use their cell phone. Captain Mitchell Stoller testified that a cell phone should not be used while serving as the dedicated lookout. The evidence at trial showed that the San Francisco Bay is a busy, highly crowded waterway used extensively by both recreational boaters and commercial vessels. On this evidence, the jury could easily conclude, and did conclude, that Captain Shonk's cell phone use contributed to the accident, and was the basis for its finding of partial fault on the part of the District. In short, the Court agrees with the parties' assessment, and finds that Captain Shonk's cell phone use was the 'causative agent' of the injuries to Claimants."); *In the Matter of the Petition of Fire Island Ferries, Inc.*, No. 11-CV-3475(DRH)(ARL), 2018 WL 718396, at *10-12 (E.D.N.Y. Feb. 5, 2018) (finding negligence with respect to a captain's texting at and before the collision and that the captain's use of his cell phone was a proximate cause of the collision and resulting injuries).

Capt. Marie had better options than attempting to exit the shallow water of the barge lane in order to turn his slow-moving, 366-foot tow in front of a rapidly-approaching ship. As set forth above, his best option was simply to stop.

The Genesis River's expert, Capt. Walt Breathwit, explained that Capt. Marie had plenty of time to stop, and, based upon his own calculations, Capt. Marie had multiple occasions where he could have simply stopped and would have avoided the collision by multiple tow lengths[23] – not just the razor-thin 20-40 feet of clearance that Capt. Cunningham postulated was Capt. Marie's best-case scenario for the turn to port maneuver that he ultimately selected.[24]   Capt. Richter likewise provided testimony that stopping was a far better option.  In fact, it is common sense.  Cars on the roadway do not turn into oncoming traffic to avoid a collision, and, unlike the roadways, Capt. Marie had the added benefit that he was transiting in a barge lane that was approximately 25 feet too shallow for the laden GENESIS RIVER.

Moreover, as explained in both the testimony and the expert reports submitted by the Genesis River Interests' experts, Capt. Marie could have further increased the distance between the GENESIS RIVER and the VOYAGER by directing his tow further to starboard.  The depths within the barge lane were all at least 12 feet as

---

[23] *See* Trial Transcript, Day 3, pp. 17-23.

[24] *See* Trial Transcript, Day 1, p. 259:51-4.

required, and, even outside the barge lane there was sufficient water, as demonstrated by the hydrographic survey materials discussed at trial.

Overall, the culpability of VOYAGER in this matter comes down to the fact that Capt. Marie allowed himself to become distracted and not in a ready and prepared position to properly assess his options and/or the VOYAGER's capabilities (particularly, the VOYAGER's ability to cross over to the green side of the channel), when he received the call from Capt. Charpentier.  Unfortunately, he acquiesced to a suggestion of a pilot that was not fully aware of the VOYAGER's characteristics and capabilities, and who was also dealing with his own momentary loss of situational awareness in the very difficult situation where the GENESIS RIVER had taken a port sheer and lost her positive navigational control.  This unfortunate combination of circumstances resulted in Capt. Marie choosing his worst option – an option that Kirby's own expert claims would have resulted in clearance of 20-40 feet if all things had gone perfectly.  Instead of essentially hitting the brakes and moving away, Capt. Marie further injected the VOYAGER into this dangerous situation.  This was due to his lack of attention and preparedness, and, thus, the VOYAGER too bears responsibility for this incident.

# IV.
## PROPOSED ALLOCATION OF RESPONSIBILITY

## BW OAK

As set forth above, the unfortunate succession of events was precipitated by the BW OAK's decision to initiate a wide turn from the wrong side of the channel, and avoiding use of the widener that was designed for and commonly used to avoid the dangerous meeting situation that unfolded on May 10, 2019.  As the BW Oak Interests' own expert conceded during trial, the BW Oak Interests have produced no examples of any other "textbook" meetings (notwithstanding the BW Oak Interests' gratuitous references to the 33,450 Houston Ship Channel transits completed by the Houston Pilots that have testified in relation to this incident) wherein the inbound vessel executed a wide turn from the wrong side of the channel.  And, in fact, the meeting between the BW OAK and the GENESIS RIVER looks nothing like the actual textbook example the BW Oak Interests referred to at trial.  The BW OAK's actions put the GENESIS RIVER in harm's way and forced her into an unfavorable position wherein she took the initial sheer from which she was ultimately unable to recover prior to the collision.  For these reasons, the BW OAK's negligence is substantial, and the Genesis River Interests propose that the BW OAK be found 30% negligent.

## VOYAGER

Obviously, the VOYAGER did not play any role in the events that caused the GENESIS RIVER to take its initial sheer and lose maneuverability.  However, Capt. Marie's prolonged and involved usage of his cell phone for over 22 minutes prior to the call from Capt. Charpentier is inexcusable.  He was obviously distracted, and he was not in a position to adequately evaluate his surroundings and options.  Instead of properly assessing the situation, he acceded to the requests of a panicking pilot that was found to have lost situational awareness himself in the very difficult situation where the GENESIS RIVER had taken a port sheer and lost her positive navigational control.  As a result, Capt. Marie chose the option to drive into oncoming traffic, namely the GENESIS RIVER, thereby placing his vessel and crew at even greater risk of harm.  The option chosen by Capt. Marie was the least likely to succeed – Kirby's own expert believed that, at best and assuming all went perfectly, the VOYAGER would have cleared the GENESIS RIVER by 20-40 feet.  As demonstrated above, a combination of stopping and going to the starboard edge of the barge lane was a far better option.  Had Capt. Marie been paying proper attention prior to the call from Capt. Charpentier, he would have been in a better position to gauge his options.  Unfortunately, he was distracted for over 22 minutes and essentially allowed someone else to drive his vessel, reflexively turning to port as soon as it was suggested by Capt. Charpentier.  Overall, in view of these

circumstances, the Genesis River Interests believe that the VOYAGER was 15% responsible for the incident.

## GENESIS RIVER

In view of the above, the Genesis River Interests accordingly propose that the GENESIS RIVER's negligence be found to be 55%. The Genesis River Interests acknowledge that the GENESIS RIVER is responsible *in rem* for the actions of her pilot who lost situational awareness. Additionally, and while it was improper for the GENESIS RIVER crew to place the vessel's radars and ECDIS ("Electronic Chart Display Information System") on standby, the testimony in this case – and common sense – shows that these were not causative factors in the collision. It was a clear day, the pilots use their PPUs to drive the ships, the locations of all the involved vessels were readily observable and known, and no lay fact witness in this case, including any of the ship pilots involved has alleged that a failure to utilize radars and/or ECDIS contributed in any way to the collision, as will be further explained below. Moreover, none of the lay fact witnesses has credibly alleged that the GENESIS RIVER crew was tired or otherwise acted improperly.[25]

---

[25] The only suggestion of improper conduct was an allegation by Capt. Charpentier that the GENESIS RIVER's helmsman had failed to comply with his rudder orders. This soundly debunked allegation was presented to – and not adopted by – the Pilot Board, and it is based upon an incorrect interpretation of the GENESIS RIVER's data. Unlike the NTSB and Capt. Cunningham, Capt. Charpentier's analysis of the VDR data failed to account for a critical timing discrepancy between the recorded audio and the vessel's parametric data, which gave him the false impression that there was a lag between his helm orders and the helmsman's actual execution of those orders.

With respect to itself, the vessel the GENESIS RIVER is a very large gas carrier, that was nearly brand new at the time of the collision on May 10, 2019, having just been delivered to her owners from the shipyard in November 2018.  The GENESIS RIVER was seaworthy in all respects at the time of her departure from Targa Terminal on May 10, 2019.  She was manned by a competent fully licensed crew as is evident by the licenses and certifications of the officers and crew who were on the bridge at the time of the collision. (Genesis River Exhibits 71-75, 78-83, 100-130).  All pre-departure tests were satisfactorily carried out as per the relevant CFR (BW Oak Exhibit 13).

The Port of Houston is a compulsory pilotage port, so Houston Pilots Craig Holland and Jason Charpentier were assigned to the GENESIS RIVER for the outbound passage.  Upon arrival onboard, the customary Master/Pilot exchange took place and the Pilots were provided with a copy of the Pilot Card, (Genesis River Exhibit 56),  which contains essential information about the vessel's particulars and maneuvering characteristics.   Importantly, both Pilots were satisfied with the Master/Pilot exchange and they so testified in their depositions.   During the Master/Pilot exchange one of the Pilots (Holland) requested from the Master to turn off the alarms for the ECDIS  and the radars in order to avoid the constant distractions and noise on the bridge when alarms go off every four to five second in the Houston Ship Channel.  (Holland Deposition 56:2-17).  Since it was not possible

to "mute" the alarms, the Master ordered the ECDIS and the radars to be placed on standby.  This unfortunate decision was against regulations and company policy; however, as will be explained below, the fact that the vessel's ECDIS and radars were put in standby mode did not contribute to the collision and could not have contributed to the collision.

The Houston Pilots' testimony was unequivocal that they use their own Personal Pilot Unit ("PPU") for navigation when conning vessels in the Houston Ship Channel and they do not rely on the ECDIS or radars. They further testified that the fact that the vessel's ECDIS and radars were in standby mode had nothing to do with the collision. (Holland Deposition p. 17:6-24); Charpentier Deposition pp. 164:8-165:8).  Additionally, there has been no testimony or evidence that the three vessels involved in this incident were not aware of each other's location in the Houston Ship Channel. On the contrary, the evidence reflects that the incident occurred during daylight hours, on a clear day, and with all three vessels communicating with each other at the relevant times.

Accordingly, the Genesis River Interests would submit to this Court that the GENESIS RIVER was seaworthy in all respects at all relevant times from the time she departed the berth at Targa Terminals to the time of the collision, and as such, they are entitled to limit their liability to the value of the vessel, after the collision, as alleged in their Petition for Exoneration from or Limitation of Liability.

Overall, while the Genesis River Interests accept the majority of the blame for the collision, both the BW OAK and the VOYAGER made critical errors, and the absence of such errors from either vessel would have avoided the collision.  None of the parties can cover itself in glory with respect to the events of May 10, 2019, and each played a material  and causative role in creating this unfortunate casualty. Accordingly, the GENESIS RIVER, BW OAK, and VOYAGER must all share responsibility for the collision and spill.

Respectfully submitted,

By: */s/ Dimitri P. Georgantas*
        Dimitri P. Georgantas
        Texas State Bar No.: 07805100
        Fed. I.D. No.: 2805
        Eugene W. Barr
        Texas State Bar No.: 24059425
        Fed. I.D. No.: 1144784
        Kevin P. Walters
        Texas State Bar No.: 20818000
        Fed. I.D. No. 5649
        ROYSTON, RAYZOR, VICKERY &
        WILLIAMS, L.L.P.
        1600 Smith Street, Suite 5000
        Houston, Texas 77002
        Telephone: 713.224.8380
        Facsimile: 713.225.9545
        dimitri.georgantas@roystonlaw.com
        eugene.barr@roystonlaw.com
        kevin.walters@roystonlaw.com

        *Attorneys for the Genesis River*
        *Interests*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 11th day of March, 2021, I served a true and correct copy of the foregoing pursuant to Rule 5 of the Federal Rules of Civil Procedure, via the CM/ECF system and/or electronic mail and/or by depositing in the United States Mail, postage prepaid and properly addressed to all known counsel of record.


 */s/ Dimitri P. Georgantas*
Dimitri P. Georgantas