# IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF TEXAS GALVESTON DIVISION

No. 3:19-cv-207

Kirby Inland Marine, *Plaintiff*,

v.

FPG Shipholding Company, *et al.*, *Defendants*.

## MEMORANDUM OPINION AND ORDER ENTERING FINDINGS OF FACT AND CONCLUSIONS OF LAW

Jeffrey Vincent Brown, United States District Judge.

This maritime action arises from a collision in the Houston Ship Channel between a large liquified-gas carrier and a tug pushing two tank barges. The collision caused one barge to capsize and the other to hemorrhage a great deal of reformate into Galveston Bay. The reformate spill, in turn, caused environmental damage which led to an abundance of third-party claims.

Following the collision, the owner of the tug and barges filed a complaint and petition for exoneration under the Oil Pollution Act and general maritime law. The court convened a bench trial to allocate fault among the vessels involved. Based on the pleadings, the evidence adduced at trial, the parties' arguments and briefing, and

1

the applicable law, the court submits these findings of fact and conclusions of law under Rule 52 of the Federal Rules of Civil Procedure.[1]

## FINDINGS OF FACT

### A.    The Parties

The plaintiff is Kirby Inland Marine, LP, a limited partnership incorporated in Delaware and headquartered in Houston. Kirby owns and operates the *Voyager*, a towing vessel, as well as the two tank barges the *Voyager* was pushing on the day of the collision, the *MMI 3041* and the *Kirby 30015T*.



*Figure 1. The Voyager*

The defendants are FPG Shipholding Panama 47 S.A., K Line Energy Ship Management, Genesis River Shipping, S.A., FPG, Ship No. 138 Co. Ltd., and Ship No. 139 Co. Ltd. (collectively, the "*Genesis River* Interests"). They are all foreign

---

[1] Any findings of fact that are also, or only, conclusions of law are so deemed, and any conclusions of law that are also, or only, findings of fact are likewise so deemed.

corporations that either own, manage, or operate the *Genesis River*, a very large gas-carrying vessel.



*Figure 2. The Genesis River*

The third-party defendants are BW VLGC Ltd., BW Gas AS, and BW Fleet Management AS. They are foreign corporations that all either own or manage the *BW Oak*, also a very large gas-carrying vessel.



*Figure 3. The BW Oak*

In the parties' pleadings and at trial, the *Voyager* blamed the *Genesis River* for the collision. For its part, the *Genesis River* charged the *Voyager* with failing to take

effective evasive action. The *Genesis River* also accused the *BW Oak* of embarrassing the *Genesis River*'s navigation, thus causing the collision.[2]

## B.    The Houston Ship Channel and Bayport Flare

The Houston Ship Channel is the busiest waterway in the United States. Its main channel is about 530 feet wide and 45 feet deep. On each side of the main channel are 235-foot barge lanes that are 12 feet deep. As the channel traverses Galveston Bay, outbound vessels, said to be on the "green side," are west of the channel's centerline. Inbound vessels, on the "red side," are east of the centerline.



*Figure 4. Houston Ship Channel Dimensions*

The Bayport Flare is a highly trafficked area near the intersection of the Houston Ship Channel and the Bayport Channel. To accommodate the high traffic and promote safer meetings between ships in the area, a "widener" has been

---

[2] In admiralty, when a vessel takes some action which in turn causes a second vessel to collide with a third, the first vessel is said to have "embarrassed the navigation" of the second.

dredged at the elbow of the channel, which provides an additional width of suitable water depth for inbound vessels.



*Figure 5. Widener at the Bayport Flare*

### C.     The Meeting Between the *Genesis River* and the *BW Oak*

On May 10, 2019, the *Genesis River* and the *BW Oak* passed each other near the elbow of the Bayport Flare. The *BW Oak* was in ballast (*i.e.*, carrying no cargo) and heading inbound on the red side of the channel. The *Genesis River*, in contrast, was outbound on the green side carrying a full load of liquid petroleum gas. Because of her loaded condition, the *Genesis River* had an even-keel trim (*i.e.*, sitting evenly on the water) and was navigating "down by the bow," rendering her sluggish and difficult to handle.

Both vessels had Port of Houston pilots on board—Captain Kent Barton on the *BW Oak* and Captains Barry Holland and Jason Charpentier on the *Genesis River*. When Captains Holland and Charpentier boarded the *Genesis River* at the Targa

Terminal earlier that day, there was a customary master–pilot exchange. During these exchanges, the master conveys certain information about the vessel to the pilot and gives him a "pilot card," which contains information about the vessel's maneuvering equipment, load, and overall condition.

During the *Genesis River*'s master–pilot exchange, her master failed to disclose two important facts to Captains Holland and Charpentier: that the *Genesis River* was a poor-handling vessel and that her voyage plan called for a maximum safe speed of 6–8 knots in the Houston Ship Channel. On top of these communication failures, when the pilots requested that the audible alarms on the vessel's Electronic Chart Display and Information System (or "ECDIS") be silenced, the crew instead placed it on standby mode—basically shutting it down. So even though each pilot carried and used his own navigation device (a "Portable Pilot Unit" or "PPU"), placing the ECDIS on standby effectively meant the *Genesis River* was sailing without a chart.

It was under these conditions that the *Genesis River* departed and began traveling outbound down the Houston Ship Channel. Captain Holland, the pilot navigating the first leg of the transit, quickly noticed how poorly the vessel handled. About halfway through the outbound transit, Captain Holland handed the conn over to Captain Charpentier. When he did, he informed his colleague that the *Genesis River* was "all over the place," difficult to handle, and required "lots of rudder" to

break "sheers" (losses of directional control). Yet not long after taking the conn, Captain Charpentier ordered the engines to "Full Sea Speed," taking the vessel up to 12 knots—4 knots above the maximum safe speed noted in her voyage plan for this part of the trip. The *Genesis River*'s crew complied and expressed no concern.

Soon, the swiftly cruising, fully loaded vessel was approaching the *BW Oak* near the Bayport Flare. When the vessels were about a mile apart, they agreed to a port-to-port, one-whistle passing (*i.e.*, a passing in which the vessels stay in their respective right-lane positions). To execute this passing arrangement, they used the "centerline approach," or "Texas chicken," which begins with each vessel navigating along the channel's centerline.[3] Then, once they are within about a half mile, each turns to the starboard side to prepare to pass the other. This maneuver facilitates a safe passing because the hydrodynamic forces acting on the vessels as they pass stern to stern help them re-align in the center once the passing is complete.

Around the time the two vessels agreed to this passing, the *BW Oak* was preparing to make a starboard turn at the flare. As she did, her stern swung out slightly to the port side, crossing the centerline by 49 feet.

---

[3] Figures 6–12 illustrate the passing of the *Genesis River* and the *BW Oak*. The ship descending from the top of each illustration is the *Genesis River*; the one moving up from the bottom is the *BW Oak*.



*Figure 6.*



*Figure 7.*



*Figure 8.*



*Figure 9.*



*Figure 10.*



*Figure 11.*



*Figure 12.*

In making the turn at the flare, Captain Barton opted against steering the *BW Oak* through the widener on the red side. If he had, Captain Barton testified, the two vessels would have been temporarily pointing directly at each other, an "uncomfortable" heading for them both.

By the time the *Genesis River* and the *BW Oak* closed to within a half mile, the *BW Oak* had completed her turn at the flare. She had then moved 134 feet to the right of the centerline, comfortably on the red side.

As the vessels passed each other, Captain Charpentier expressed no concern that the *BW Oak* was squeezing the *Genesis River* against the channel bank on her starboard side, did not ask the *BW Oak* for more room, nor ever suggested that the *BW Oak*'s position in the channel otherwise impeded the *Genesis River*'s navigation. In fact, Captain Charpentier has never criticized the *BW Oak*'s handling of the

vessels' meeting. Captain Charpentier, the Houston Pilots, and both vessels' bridge teams all agree: there was nothing unusual about the passing.

## D.    The Collision

After passing the *BW Oak*, the *Genesis River* continued on the green side of the channel, still making 12 knots. She soon prepared for another passing, this time with a tug in the barge lane on the red side, the *Voyager*. The *Voyager*, captained by Tony Marie, was pushing two barges, both of which were fully loaded with reformate (a gasoline-blending stock), and was making about 5 knots. Like her meeting with the *BW Oak*, the *Genesis River* was on course for a customary port-to-port, one-whistle passing of the *Voyager*—that is, the *Genesis River* would stay on the green side and the *Voyager* would stay on the red side.

But this course soon changed. Just before the projected meeting, the *Genesis River* "took a sheer," sending her toward the red side of the channel.[4] Concerned about his direction and the impending meeting with the *Voyager*, Captain

---

[4] This sheer was caused by "bank effect," which is the hydrodynamic tendency of a ship's stern to swing toward the near bank and the bow to swing toward the center of the channel, causing the vessel to sheer away from the bank. Bank effect is exacerbated by excessive speed. The *Genesis River* was paralleling the green-side bank of the channel when the sheer occurred.

Charpentier radioed to Captain Marie[5] to remain alert as he was trying to get the *Genesis River* under control:

| | |
|---|---|
| Charpentier: | Come in there, *Voyager*. |
| Marie: | [Responds] |
| Charpentier: | It's that ship looking at ya' . . . trying to check this thing . . . just keep an eye on me. |
| Marie: | Roger, roger. |

Shortly after this exchange, Captain Charpentier realized he was losing control of the *Genesis River*. To try to break the sheer and regain control, Captain Charpentier asked the *Genesis River*'s crew for "more RPMs . . . give me everything you got." But his request went unheeded. He radioed Captain Marie again, warning that his vessel was not responding and directing him to head to the green side of the channel:

| | |
|---|---|
| Charpentier: | She's not checking up, *Voyager*. |
| Marie: | What do you need me to do? |
| Charpentier: | Go to the greens. |
| Marie: | Go to the greens. |

This second exchange established a new passing agreement—a starboard-to-starboard, two-whistle passing. Complying, Captain Marie immediately steered hard

---

[5] The evidence shows that when Captain Charpentier radioed the *Voyager*, Captain Marie, who was at the helm, had his cell phone in his lap in violation of Kirby company policy. The evidence also shows that Captain Marie quickly tossed the phone aside as soon as he heard from the *Genesis River*.

to port. Captain Charpentier radioed again to Captain Marie, this time with heightened urgency:

| | |
|---|---|
| Charpentier: | You need to go straight to the greens . . . take a ninety to the greens [because] I'm going to go your way again, probably. |
| Marie: | Roger roger, straight over. |

While Captain Marie tried to move the *Voyager* to the green side, the *Genesis River* crossed the channel's centerline and entered the barge lane where the *Voyager* had been. Had the *Genesis River* maintained this new position on the red side of the channel, she would have complied with the new starboard-to-starboard agreement. But, as Captain Charpentier predicted, she did not. Shortly after she darted to the red side of the channel, the *Genesis River* took yet another sheer, which sent her back toward the green side where the *Voyager* had fled.

Both Captain Marie and Captain Charpentier now realized that a collision was certain. Seconds after the vessels' crews braced for impact, the *Genesis River*'s bow sliced into one of the barges (the *Kirby 30015T*), nearly cutting her in half, and reformate gushed into the channel. The force of the impact also caused the other barge (the *MMI 3041*) to capsize. Fortunately, though the damage to the vessels was great and the spill catastrophic, there was no loss of life.



*Figure 13.*



*Figure 14.*

15

# CONCLUSIONS OF LAW

### A.    Jurisdiction and Venue

This court has jurisdiction over this dispute under 28 U.S.C. § 1333, Rule 9(h), of the Federal Rules of Civil Procedure, and Supplemental Admiralty Rules C and F. Venue is proper in the Southern District of Texas under Supplemental Admiralty Rule F(9).

### B.    The Oil Pollution Act

Because the collision caused the discharge of a large amount of reformate into Galveston Bay, the Oil Pollution Act applies. Among other things, the Oil Pollution Act, 33 U.S.C. § 2701, *et seq.*, addresses the liability arising from oil pollution in the navigable waters of the United States.

The act specifically subjects each "responsible party" to liability for the cost of removing the oil and the damages caused by the spill. 33 U.S.C. § 2702(a). At first, the "responsible party" is the owner of the vessel from which the pollutants have escaped. *Id.* The owner, however, can offload that liability by establishing that "the discharge and the resulting removal costs and damages were caused solely by an act or omission of one or more third parties . . . ." *Id.* § 2702(d)(1)(A). Proving that a third party was the sole cause of the discharge is a complete defense to liability. *Id.*

§ 2703(a). Once established, the initially designated responsible party has a right to recover its removal costs and damages from the third party. *Id.* § 2708(a)(1).

The act limits the liability of responsible parties based on the size and tonnage of each offending vessel. *See id.* § 2704(a). There are, however, exceptions to the liability limits. Relevant here, the limits do not apply "if the incident was proximately caused by . . . the violation of an applicable Federal safety, construction, or operating regulation[.]" *Id.* § 2704(c)(1)(B). For example, if a responsible party violates the Inland Navigation Rules, the liability limits do not apply. *See, e.g., In re Settoon Towing, LLC*, No. CV 14-499, 2016 WL 9447753, at *7 (D. La. Mar. 21, 2016) (holding that a violation of one of the Inland Navigation Rules precluded limiting liability under the act); *see also United States v. Am. Comm. Lines*, 875 F.3d 170, 178 (5th Cir. 2017) (holding that violations of rules intended to prevent oil spills precludes limiting liability under the act).

### C.    Negligence and Inland Navigation Rules

The elements of negligence in an admiralty case are the same as at common law: the plaintiff must prove by a preponderance of the evidence that (1) the defendant owed the plaintiff a duty, (2) the defendant breached that duty, and (3) the breach caused the plaintiff's injuries. *See Canal Barge Co., Inc. v. Torco Oil Co.*, 220 F.3d 370, 376 (5th Cir. 2000). "The applicable standard of care in a collision

case stems from the traditional concepts of prudent seamanship and reasonable care, statutory and regulatory rules, and recognized customs and uses." *Stolt Achievement, Ltd. v. Dredge B.E. Lindholm*, 447 F.3d 360, 364 (5th Cir. 2006).

The Inland Navigation Rules, codified in the Code of Federal Regulations, 33 C.F.R. § 83.01, *et seq.*, provide the "rules of the road" for vessels navigating on the inland waters of the United States, including the Houston Ship Channel. The broad purpose of these rules is to prevent collisions. To that end, the rules require vessels to travel at safe speeds, use available equipment to determine and avoid risks of collision, and proceed along the outer limits of narrow channels.

### D.    The *Genesis River*'s Negligence and Violations of the Rules

Based on the arguments and evidence submitted at trial, the court concludes that the *Genesis River*'s negligence and violation of Rules 6, 7, and 9 of the Inland Navigation Rules caused the collision with the *Voyager* and her two barges.

Rule 6—Safe Speed, 33 C.F.R. § 83.06—requires vessels to "proceed at a safe speed so that [they] can take proper and effective action to avoid collision and be stopped within a distance appropriate to the prevailing circumstances and conditions." The *Genesis River* violated this rule by making 12 knots ("Full Sea Speed") as she navigated through the channel—4 knots over the voyage plan's maximum proposed safe travel speed. The *Genesis River*'s excessive speed, which

likely caused or at least exacerbated the various sheers she took, led her to lose control and collide with the *Voyager* and her barges. Had the *Genesis River* traveled at a safe speed, she could have at least partially abated the hydrodynamic forces she encountered, widened her margin for error, and gained more time to take evasive action.

Rule 7—Risk of Collision, 33 C.F.R. § 83.07(a)—requires vessels to "use all available means appropriate to the prevailing circumstances and conditions to determine if risk of collision exists." The *Genesis River* violated this rule by failing to make use of her radar and ECDIS. Had the *Genesis River* done so, her bridge team would have been more situationally aware and cognizant of the risks of collision attending her excessive speed.

Rule 9—Narrow Channels, 33 C.F.R. § 83.09(a)(i)—requires vessels to proceed "along the course of a narrow channel" and "keep as near to the outer limit of the channel . . . as is safe and practicable." The *Genesis River* violated this "rigidly enforced" and "important safety regulation," *The Standella*, 108 F.2d 619, 620 (5th Cir. 1939), at least twice: once when she crossed over to the red side of the channel, prompting the urgent two-whistle agreement, and once when she sheered back to the green side, ultimately colliding with the *Voyager* as she tried to escape. Had the

*Genesis River* maintained a position, in either instance, "as near to the outer edge of the channel . . . as is safe and practicable," she could have avoided the collision.

The *Genesis River*'s negligence was the sole cause of the collision. She breached her duty to the *Voyager* as a passing vessel by speeding, operating without her radar equipment, and failing to maintain a safe position in the channel. And because this negligence manifested as violations of the Inland Navigation Rules, the Oil Pollution Act's liability limits do not apply. 33 U.S.C. § 2704(c)(1)(B).

Moreover, the *Genesis River* has failed to show that any responsibility for the collision ought to be apportioned to either the *BW Oak* or the *Voyager*. Based on the evidence adduced at trial, nothing about the *Genesis River*'s meeting with the *BW Oak* appears unusual. It was, by all accounts, an uneventful passing that contributed nothing to the *Genesis River*'s subsequent loss of control.[6] Nor, by the same token, does the *Voyager* bear any of the blame. Although it is true Captain Marie was looking at his phone before the *Genesis River* radioed to him, there was no evidence this impaired his response. Ultimately, the *Genesis River*'s speed and directional instability simply gave the *Voyager* insufficient time or space to avoid the collision. *Cf. Afran Transp. Co. v. S/S Transcolorado*, 458 F.2d 164, 166 (5th Cir. 1972) ("[T]he

---

[6] At trial, the defendants accused the *BW Oak* of not giving the *Genesis River* enough room when they passed, thus forcing the *Genesis River* too near the bank and causing the sheer. But not even Captain Charpentier believed that to be true.

one who is put to a sudden choice of action to avoid hazard created by the patent fault of the other has considerable latitude."). The court apportions no negligence to either the *Voyager* or the *BW Oak* and concludes that neither violated any of the Inland Navigation Rules.

### E. Kirby's Damages

Maritime law permits parties to recover money damages resulting from a collision caused by the negligence of another party. Damages include the cost of vessel repair, loss of use, out-of-pocket costs of wreckage and cargo removal, salvage, drydocking, and caring for the damaged vessel. *Marathon Pipe Line Co. v. Drilling Rig Rowan/Odessa*, 761 F.2d 229, 233 (5th Cir. 1985); *Todd Shipyards Corp. v. Auto Transp., S.A.*, 763 F.2d 745, 754 (5th Cir. 1985).

Kirby and the *Genesis River* Interests have stipulated to the damages they incurred because of the collision. *See generally* Dkt. 580. According to Kirby, it suffered $7,936,897 in collision damages and $9,461,591 in spill-response damages. As the party solely at fault for the collision, the *Genesis River* Interests are liable to Kirby for $17,398,488. In making this determination, the court knows that the third-party claimants' damages remain pending. Those damages will be determined separately.

*    *    *

In sum, the court finds that the *Genesis River* is 100% at fault for the collision with the *Voyager* on May 10. 2019. And because the cause of the collision was the *Genesis River*'s violation of certain Inland Navigation Rules, the liability limits in the Oil Pollution Act do not apply.

Signed on Galveston Island on the 8th day of July, 2021.

_____

JEFFREY VINCENT BROWN
UNITED STATES DISTRICT JUDGE