**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION**

| | | |
|---|---|---|
| **KIRBY INLAND MARINE, LP** | § | |
| | § | |
| **v.** | § | **C.A. NO. 3:19-cv-00207** |
| | § | |
| **FPG SHIPHOLDING PANAMA 47 S.A.,** | § | |
| **K LINE ENERGY SHIP MANAGEMENT,** | § | |
| **and the VLGC GENESIS RIVER,** *in rem* | § | |

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

| | | |
|---|---|---|
| **IN THE MATTER OF KIRBY INLAND** | § | |
| **MARINE, LP, in a cause for exoneration** | § | **Rule 9(h) – Admiralty** |
| **from or limitation of liability** | § | |

**THE GENESIS RIVER INTERESTS'
MOTION TO EXCLUDE TESTIMONY OF BELLWETHER CLAIMANTS'
EXPERTS PAUL MONTAGNA AND GABRIEL JOHNSON**

FPG Shipholding Panama 47 S.A., Ship No. 138 Co. Ltd., Ship No. 139 Co. Ltd., Genesis River Shipping, S.A., and "K" Line Energy Ship Management Co., Ltd. (the "Genesis River Interests") file this Motion to Exclude Testimony of Bellwether Claimants' Experts Paul Montagna and Gabriel Johnson:

**I.
INTRODUCTION & SUMMARY**

Bellwether Claimants are ten representative individuals and businesses engaged in Galveston Bay's local seafood industry. They are part of a group of about 2,000 plaintiffs that claim the May 10, 2019 reformate spill near the Bayport Flare decimated local seafood populations. They further claim the spill will substantially impair their earnings for many years to come.

Bellwether Claimants retained two expert witnesses on causation – Paul Montagna, Ph.D. and Gabriel Johnson. Despite their designated roles, neither Dr. Montagna nor Mr. Johnson made any effort to meaningfully analyze the alleged cause-and-effect relationship between the spill and its purported impact upon local seafood populations.

Dr. Montagna has not performed any post-incident sampling or inspection of Galveston Bay's waters or marine life. Mr. Johnson's investigation was hardly better. He likewise has not taken or reviewed water samples, and his post-incident analysis consisted of digging up three, one-square-meter oyster bed samples in August 2019. Mr. Johnson simply observed some dead oysters in the samples. The samples did not go to a lab for further analysis, and Mr. Johnson made no further attempt to otherwise investigate the cause of death of the dead oysters he observed.

Dr. Montagna and Mr. Johnson have presented no evidence of any quantitative measurements establishing the post-spill concentration of reformate in any particular area of Galveston Bay. They have presented no evidence that reformate was present at toxic levels. Likewise, they have developed no factual, objective evidence from testing results or sampling that reformate physically came into contact with oyster beds or other marine life.

The causation opinions of Dr. Montagna and Mr. Johnson are not relevant, reliable or scientifically valid under Fifth Circuit precedent and *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993). They should be excluded from evidence.

## II.
## FACTS

On May 10, 2019 at 3:16 pm, the VLGC GENESIS RIVER collided with Kirby Barge 30015T just below the Bayport Flare in Galveston Bay. A portion of the barge's reformate cargo spilled. Kirby immediately implemented its major spill response plan and promptly dispatched teams to contain the spill and sample the air and water to ensure the safety of the surrounding areas. At 3:41 p.m., the United States Coast Guard activated the incident command system at its Sector Houston-Galveston headquarters.[1] By 7:35 p.m., spill containment booms had been deployed at the collision site and additional booms were being installed across inlets and other areas around Galveston Bay. Seven skimmer vessels were deployed to recover the reformate/water mixture in the vicinity of the collision site.[2] 2,700 water samples were taken during the spill response activities. None of the water samples showed pollution levels requiring action.[3]

On the day of the spill, the Texas Department of State Health Services (DSHS) issued a precautionary notice advising people that the spill "may temporarily affect safety of seafood" harvested in Galveston and Trinity Bays north of a line from the end of the Texas City Dike to Smith Point:

---

[1]     NTSB Marine Accident Report, attached as Exhibit 1, p. 15.
[2]     *Id.*
[3]     *Id.*



On May 12, 2019, the Galveston County Health District issued a public advisory

stating that local seafood impacts, if any, would be short-lived:

> "The chemical involved, a gasoline additive called reformate, evaporates quickly and is not expected to accumulate in fish tissue once it's gone from the water, so any impact on seafood should be resolved in the coming days or weeks."[4]

The temporary warning and a precautionary closure of limited private oyster

harvesting areas remained in effect for about two weeks (ending no later than May 25).[5]

DSHS did not issue any further spill-related warnings or restrictions. As stated in the

Galveston County Health District's separately-issued news release:

> "The Department of State Health Services lifted the temporary warning to not eat seafood from portions of Galveston and Trinity bays. Private oyster harvesting is reopened."[6]

---

[4] A copy of the Galveston County Health District's notice is attached as Exhibit 2 (also available at https://www.gchd.org/Home/Components/News/News/2243/65).

[5] *See* DSHS Seafood and Aquatic Life Group Status of Shellfish Harvesting Areas (May 25, 2019), attached as Exhibit 3 (also available at https://bit.ly/3lSbWVd). The closure of TX 6 was unrelated to the spill and attributed to recent rainfall events. The map may be accessed via the following link: https://www.dshs.texas.gov/seafood/MapsPDF/ShellfishClassificationMaps/GAL_2018.doc?terms=galveston+bay+map. Public oyster harvesting was out of season and closed at the time of the spill.

[6] *See* Exhibit 2.

Despite the short-lived and very limited closure, the efficacy of the spill response and recovery efforts, and the fact that 2,700 post-incident water samples did not reveal any contamination findings necessitating further action, Bellwether Claimants allege the spill has caused them to suffer economic damages in the form of lost profits that will persist for many years to come. Bellwether Claimants have proceeded with these assertions despite the fact that they have zero evidence that any portion of the spilled reformate reached any of the private oyster beds or otherwise had meaningful impacts upon seafood populations.

In an attempt to prove that reformate from the spill reduced their seafood catch, Bellwether Claimants rely on the expert testimony of marine ecologist Dr. Paul Montagna, as well as a biologist, Gabriel Johnson. Dr. Montagna and Mr. Johnson have provided their reports and been deposed. Although nothing in this Motion attempts to discredit Dr. Montagna's and/or Mr. Johnson's qualifications, the Court should nevertheless exclude the testimony of Dr. Montagna and Mr. Johnson, because their testimony is not reliable due to failing to perform proper testing, relying on insufficient facts, and failing to account for alternative explanations.[7]

### III.
### INCORPORATION OF EVIDENCE BY REFERENCE

This Motion is supported by the pleadings on file and the following evidence, which is attached hereto and incorporated by reference:

---

[7] The Genesis River Interests reserve the right to raise qualification issues at a later time. But, given the complete lack of any meaningful investigation and analysis by Dr. Montagna and Mr. Johnson, the Genesis River Interests' Motion focuses on those glaring deficiencies.

    A.      Expert Report of Paul Montagna, attached hereto as Exhibit 4.[8]

    B.      Deposition of Paul Montagna, attached hereto as Exhibit 5.

    C.      Expert Reports of Gabriel Johnson, attached hereto as Exhibits 6 and 7.[9]

    D.      Deposition of Gabriel Johnson, attached hereto as Exhibit 8.

## IV.
## ARGUMENT AND AUTHORITIES

District courts act as "gatekeepers" in excluding expert testimony. *Seatrax, Inc. v. Sonbeck Int'l, Inc.*, 200 F.3d 358, 371-72 (5th Cir. 2000). "This so-called 'gate-keeping' function applies to all types of expert testimony, not just 'scientific' testimony." *Id.* at 372.

**A.    An expert's opinion must be reliable to be admissible.**

A court should exclude the testimony of an expert if it is not reliable. *Kuhmo Tire Co. v. Carmichael*, 526 U.S. 137, 149 (1999); *Daubert v. Merrell Dow. Pharms., Inc.*, 509 U.S. 579, 592-93 (1993). An expert witness may be qualified and highly credible, but his conclusions may be based on unreliable methodology. Scientific evidence that is not grounded in the "methods and procedures of science" is no more than "subjective belief or unsupported speculation." *Daubert*, 509 U.S. at 590.

For an expert's testimony to be considered reliable, the "party seeking to introduce expert testimony must show (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has reliably

---

[8]    The Genesis River Interests' proffer of Dr. Montagna's expert report is for the limited purpose of this Motion. The Genesis River Interests expressly reserve, and do not waive, their objections to same, including, but not limited to, hearsay, double hearsay, and cumulative.

[9]    The Genesis River Interests' proffer of Mr. Johnson's expert reports is for the limited purpose of this Motion. The Genesis River Interests expressly reserve, and do not waive, their objections to same, including, but not limited to, hearsay, double hearsay, and cumulative.

applied the principles and methods to the facts of the case." *Huss v. Gayden*, 571 F.3d 442, 452 (5th Cir. 2009) (quoting *Smith v. Goodyear Tire & Rubber Co.*, 495 F.3d 224, 227 (5th Cir. 2007)); FED. R. EVID. 702. "*Daubert* identifies a nonexhaustive list of factors a district court should consult in assessing the reliability of expert testimony: (1) whether the theory can or has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error; (4) the existence and maintenance of standards and controls; and (5) whether the theory has been generally accepted in the relevant scientific, technical, or professional community." *Cannon v. BP Products N. Am., Inc.,* 2013 WL 5514284, at *6 (S.D. Tex. Sept. 30, 2013) (citing *Daubert*, 509 U.S. at 593-94). While further "guideposts" have been developed following *Daubert,* a court has the "discretion to consider … [the] factors it deems relevant." *Guy v. Crown Equip. Corp.*, 394 F.3d 320, 325 (5th Cir. 2004) (citing *Kuhmo*, 526 U.S. at 151).

The purpose of the reliability requirement is to ensure the expert uses the same level of intellectual rigor as other experts in the same field. *Kuhmo*, 526 U.S. at 152. Here, because Dr. Montagna's and Mr. Johnson's opinions run wide of these guideposts, and fail to demonstrate the rigor of similar experts in their field, the Court must exclude these unreliable opinions.

**B.**     **The opinions of Dr. Montagna and Mr. Johnson are unreliable for: failing to perform proper testing, relying on insufficient facts, and failing to account for alternative explanations.**

Much like their support and analysis, the substance of Dr. Montagna's and Mr. Johnson's conclusions are remarkably empty, and such deficiencies are discussed, in turn, below.

1.      **There is a complete lack of any proper, or even improper, testing to support Dr. Montagna's marine loss opinions.**

In essence, Dr. Montagna concludes that the combination of location, lifestyle of estuary organisms, and toxicity of the spilled reformate means that local marine organisms were harmed and may continue to be harmed for as long as 10 years following the spill.[10] But, because the support and methodology for these conclusions fail to meet many of the *Daubert* guideposts, these opinions should be excluded.

The Court should consider whether the theory or technique underlying the expert's testimony has or can be tested. *Daubert*, 509 U.S. at 593. For example, expert opponents often object that the expert has not conducted any studies or analyses to substantiate the opinion. *Wheat v. Pfizer, Inc.*, 31 F.3d 340, 343 (5th Cir. 1994). Here, there can hardly be any argument that the opinions of Dr. Montagna are scientific in nature, in that they purport to analyze the alleged long-term effects of spilled reformate on marine life in a specific marine environment. But without empirical data and testing, Dr. Montagna's opinions are not sufficiently supported or verifiable.

In *Wheat v. Pfizer, Inc.* the Fifth Circuit Court of Appeals analyzed a doctor's opinions regarding causation in a prescription drug case, noting the opinions "would not have survived the test of" *Daubert* for lack of testing. 31 F.3d at 343 (citing *Daubert*, 509 U.S. 579). *Wheat* stated that:

> Under *Daubert,* before the district court permits expert scientific testimony, it must determine "whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue." Key to this test is whether the expert's hypothesis can be and has been tested.

---

[10]      Exhibit 4, p. 14.

*Id.* At a hearing in district court to evaluate the testimony, the proposed expert admitted "that no study of the combined effects of the drugs [at issue] had ever been done, and thus his hypothesis lacked an empirical foundation." *Id.* Neither had his method been subjected to peer review and publication, which *Daubert* also identifies as key. *Id.*

The Eastern District of Louisiana reached a similar conclusion in *In re Midland Enterprises* regarding proffered expert testimony related to paint fumes aboard a vessel. 2002 WL 31780156, at *2 (E.D. La. Dec. 11, 2002). With respect to the expert's testimony on the alleged lack of proper ventilation, he: admitted that he did not perform any tests, did not measure the air flow through a void space (instead, he just stood in the space and felt for air flow), agreed there was no way to objectively duplicate the basis of his opinion, and acknowledged he did not utilize any tests to determine the presence of vapors, nor did he examine the air under conditions similar to those which existed when the alleged accident occurred. *Id.* Excluding this expert's opinion, the court found that the expert's opinions were "based on his own subjective speculations and not on any theory that can or has been tested as required by the first *Daubert* factor." *Id.* Dr. Montagna's opinions suffer the same deficiencies here.

In his report, Dr. Montagna admits that "no comprehensive survey was performed to quantify the shrimp or oyster killed during or after the spill."[11] Again, while Dr. Montagna's own report indicates that the utility of sampling and the fact that he participated in extensive "Deepwater Sediment Sampling to Assess Potential Post-Spill Benthic Impacts from the Deepwater Horizon Oil Spill"[12], Dr. Montagna has not taken or reviewed

---

[11]     Exhibit 4, p. 15.
[12]     Exhibit 4, p. 4.

any sampling in this case. The following are yet more examples of the glaring deficiencies

in Dr. Montagna's "analysis" in this case:

- Dr. Montagna's analysis of the environmental effects on the fishing and shellfish industry as a result of the spill was limited to a short literature review (Exhibit 5 at p. 13:12-18, pp. 27:12-28:6);

- His report only refers to shrimp and oysters (*Id.* at pp. 13:19-14:3; *see also* Exhibit 4);

- Dr. Montagna did not do any sampling of the spilled reformate cargo (*Id.* at p. 24:21-24);

- He did not do any modeling in this case (*Id.* at pp. 24:25-25:1);

- Dr. Montagna did not do any analysis projecting where the spilled reformate may have gone within Galveston Bay (*Id.* at p. 25:2-4);

- He only spent 9 hours on his literature review in preparation of his report (*Id.* at p. 27:4-11);

- The first 15 pages of Dr. Montagna's report are identical to the first 15 pages in his expert report submitted in the SUMMER WIND matter from 2015-2016 (*Id.* at p. 28:21-25 see also Exhibit 9, Dr. Montagna's report in SUMMER WIND matter);

- The first 15 pages of his report are broad declarative statements with nothing specific to the subject reformate spill (*Id.* at p. 29:1-24);

- Dr. Montagna does not have any evidence of any diminishment of biodiversity (*Id.* at p. 30:2-15);

- He lacks any specific sampling, testing, or any type of quantitative measurement showing any specific concentration of reformate in any particular area of Galveston Bay (*Id.* at p. 30:16-20);

- Dr. Montagna acknowledges that knowing how much of what chemical is present in what location would provide "more information to make an assessment" (*Id.* at p. 31:2-10);

- He has no other information other than the fact there was a reformate spill on which to base his assessment (*Id.* at p. 31:11-14);

- Dr. Montagna is unaware of any surveys performed to quantify shrimp or oysters killed during or after the spill (*Id*. at p. 32:1-5);

- Dr. Montagna has no evidence that the reformate was widely disbursed in critical areas other than "a combination of tides, winds, and currents" (*Id*. at p. 33:13-23);

- While acknowledging that to affect a marine organism, a chemical has to be present in a sufficient concentration for a sufficient period of time, Dr. Montagna did not have any specific information on quantity, concentration, or location of reformate, because he did not have the benefit of reviewing testing of any samples (*Id*. at p. 34:10-25);

- He lacked any information about contamination levels anywhere in Galveston Bay (*Id*. at pp. 35:23-36:2);

- Dr. Montagna was unaware of any evidence of any acute response of any marine organisms caused by the spill (*Id*. at p. 37:9-11);

- Pages 16 through 18 of Dr. Montagna's May 2021 report do not relate to anything specific to the reformate spill but are simply demonstrating (1) chronologically when brown shrimp were must abundant in Galveston Bay; and (2) when oysters are most abundant and have the greatest shell length (*Id*. at pp. 38:7-41:9);

- He lacks any evidence of oyster exposure to reformate except for the fact that a spill occurred in Galveston Bay (*Id*. at p. 42:2-12);

- Dr. Montagna has no factual evidence from testing results or sampling that the reformate reached any oyster beds (*Id*. at pp. 42:16-43:1);

- In forming his opinions, Dr. Montagna did not review any actual contamination data or sampling reports (*Id*. at p. 47:8-11);

- In forming his opinions, Dr. Montagna was not able to determine if there was reformate present at toxic levels at any location in Galveston Bay (*Id*. at p. 47:12-18);

- Dr. Montagna did not review any data showing reduced harvest or catch of either oysters or shrimp subsequent to the spill (*Id*. at p. 47:19-25);

Like the proposed expert in *In re Midland*, Dr. Montagna admits his opinion is devoid of testable or verifiable facts or data:

21· · · · · Q.··Sure.··I gotcha.··In this case, did you do any
22··sampling of the product specifically spilled from the
23··Kirby barge?
24· · · · · A.··No.
25· · · · · Q.··Did you do any modeling in this case?

·1· · · · · A.··No.
·2· · · · · Q.··Did you do any analysis projecting where this
·3··material may have gone within the bay?
·4· · · · · A.··No.

Exhibit 5 at pp. 24:21-25:4. By offering an empty "analysis", he should be excluded for

failure to meet the first *Daubert* factor. As stated, no testing has been done by Dr.

Montagna, and the Genesis River Interests have no means of conducting tests or studies to

verify the veracity of his opinions.

Being dangerously thin, Dr. Montagna's opinions should be excluded for failure to

meet the first *Daubert* reliability factor.

**2.** **Mr. Johnson's "analysis" likewise lacks any meaningful sampling or testing.**

Mr. Johnson was retained to evaluate potential damage to private oyster leases in

Galveston Bay. While Mr. Johnson at least visited Galveston Bay as part of his

investigation, his methodology was still barren of proper sampling and testing.

- Mr. Johnson attended three private oyster leases about three months after the collision, on August 6, 2019. Exhibit 8 at pp. 11:21-12:21.

- The three oyster lease areas are respectively 160 acres, 65 acres, and 60 acres in size. *Id.*

- Mr. Johnson retrieved a one-square-meter oyster bed sample for each of the three beds. *Id.* at p. 19:6-12, p. 100:2-5. Each sample took him about 15-30 minutes to collect. *Id.* at pp. 96:23-97:3. Thus, Mr. Johnson's on-site "investigation" took about 45-90 minutes to complete.

- The total footprint of the six leases at issue in Mr. Johnson's two reports is 13,024,440 square feet. The total area selectively sampled by Mr. Johnson was about 32 square feet – roughly .0002% of the total area of the six leases.

- Although Mr. Johnson observed dead oysters in his samples, he confirmed that he did not undertake any analysis as to whether the spilled reformate reached any of the private oyster leases, and he further confirmed that he has no evidence as to whether the reformate reached the oyster leases. *Id.* at pp. 83:12-85:7.

- Mr. Johnson has not undertaken an analysis of whether oyster spat volume decreased as a result of the spill, and he does not know oyster spat decreased due to the spill. *Id.* at pp. 45:19-46:5.

- Mr. Johnson's Shrimps R Us Report concludes the mortality caused by the reformate resulted in crop losses to Leases 390A, 391A, 392A, 427A and 432A of $5,903,677.[13] The conclusion has the following issues:

  o After the spill, Mr. Johnson sampled only Leases 390-392A and no sampling of Leases 427A and 432A was done.

  o Mr. Johnson does not provide the sampling results for Leases 390-392, only the average density. Thus, his report provides no means for which to validate the approach and his results.

  o As noted above, Mr. Johnson's "sample" to establish a causal link and the foundation for his conclusion, was comprised of one dive per lease and a sample size of one square meter each.

  o Mr. Johnson testified he only sampled Leases 390-390A due to the leases' "close proximity." *Id.* at p. 51:1-20. Yet, Leases 390-392A, while grouped together, were 4 miles from Lease 430A, 2.5 miles from Lease 427A, and 1.5 miles from Lease 432A – not exactly in close proximity, and all were in different depths.

- Mr. Johnson's Ivo Slabic Report concludes the mortality caused by the reformate resulted in crop losses to Lease 430A of $2,169,305.[14] The conclusion has the following issues:

  o Mr. Johnson did no sampling of Lease 430A.

---

[13]   *See* Exhibit 7.
[14]   *See* Exhibit 6.

- o He assumed the mortality of Lease 430A was similar to the <u>projected</u> average mortality of Leases 390, 391, and 392, which was beset with its own flaws.

- o Lease 430A was four miles from the Leases 390-392 and in shallower water.

- Mr. Johnson is not an accountant or economist. Exhibit 8 at p. 102:18-21. Nevertheless, he has attempted to quantify the damages of Bellwether Claimants Ivo Slabic and Shrimps R Us. He is not qualified to opine on economic losses, causation, mortality due to the spill, or the distribution of the reformate throughout the bay. The key variables in Mr. Johnson's calculations are comprised of projections, verbal Bellwether Claimant statements, and assumptions, all suffering from the same lack of evidence.

- Mr. Johnson concludes that the oyster leases suffered extremely high mortality and huge standing crop losses, yet Mr. Johnson can provide no evidence that the reformate reached any of these leases.

- Mr. Johnson's Reports do not disclose the data and other information considered by the expert in forming his opinions, merely the results of his analysis. In each of his reports, Mr. Johnson fails to provide the basis for his conclusions and the data that he analyzed. Only the results of his final calculations are provided, typically in tables and without any means for their validity or accuracy to be tested and verified.

3. **The limited support that Dr. Montagna and Mr. Johnson have relied upon, as well as their conclusions, are nothing more than *ipse dixit*, and accordingly have no evidentiary value.**

Even a qualified expert, "under Rule 703, must base his opinions on *facts* and data of a type reasonably relied upon by experts in the field." *Allen v. Penn. Engineering*, 102 F.3d 194, 196 (5th Cir. 1996) (emphasis added) (holding that "none of the scientific data on which appellants' experts rely furnishes a scientifically valid basis for the[ir] conclusion[s]" when they offered "suggestive" epidemiological evidence, unreliable animal studies that were speculative at best, and inconclusive cell biology). Mere conclusions reached without critical analysis fall short of satisfying this requirement:

> [N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is

> connected to existing data only by the *ipse dixit* of the expert.
> A court may conclude that there is simply too great an
> analytical gap between the data and the opinion proffered.

*General Electric Co. v. Joiner*, 522 U.S. 136, 146 (1997) (no abuse of discretion in excluding expert testimony because "the studies upon which the experts relied were not sufficient … to support their conclusions that Joiner's exposure to PCB's contributed to his cancer"). "If the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied *to the facts*. The trial court's gatekeeping function requires more than simply "taking the expert's word for it." FED. R. EVID. 702 advisory committee's note, 2000.

"*Ipse dixit*" means "[s]omething asserted, but not proved." *Black's Law Dictionary* 372 (2d pocket ed. 2001). "The existence of sufficient facts… is in all instances mandatory. 'Without more than credentials and subjective opinion, an expert's testimony that 'it is so' is not admissible." *Hathaway v. Bazany*, 507 F.3d 312, 318 (5th Cir. 2007) (quoting *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 424 (5th Cir. 1987)). A district court cannot be forced to admit opinion evidence "that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered. *Joiner*, 522 U.S. at 146.

Here, Dr. Montagna and Mr. Johnson provide no useful factual analysis or detail with respect to the actual incident at hand, instead relying mostly on their experience in the field. They do not sufficiently explain how that experience leads to the conclusions

reached, why that experience is a sufficient basis for the opinion, or how that experience is reliably applied to the facts. FED. R. EVID. 702 advisory committee's note, 2000.

For example, the only discussion in Dr. Montagna's report specifically related to this incident consists of background information. The remainder of the report leading up to his generic conclusions is a broad-form discussion of Texas estuary ecosystems, Galveston Bay, oil spills behind barrier islands and in bays, general lifestyle of estuary organisms, and the toxicity of oil to these organisms. Dr. Montagna fails to drill down deeper and gather any specific facts or relevant information to support his conclusions with respect to this case.

- Dr. Montagna did not consult with any other experts (Exhibit 5 at p. 47:22–25), although he reviewed an expert report by Gabriel Johnson (*Id.* at p. 14:9–20) with regard to oysters.

Instead, Dr. Montagna's opinions on the environmental effects on the fishing and shellfish industry as a result of the reformate spill "was limited to a short literature review." (Exhibit 5 at pp. 13:12–18; 27:12; 28:2–6).  Dr. Montagna was not shy that the entire basis for his opinion in this case is essentially *ipse dixit*:

> ·1· · · · Q.··Okay.··And, again, not to demean in any way,
> ·2··shape, or form, but the first four opinions are just
> ·3··general proclamations about estuaries are sensitive, oil
> ·4··spills behind barrier islands could be bad.··I mean,
> ·5··there's general conceptual points, aren't they?
> ·6· · · · A.··True.
> ·7· · · · Q.··I mean, there's nothing specific to this case
> ·8··that's included in the first fifteen pages of your
> ·9··report, is there?
> 10· · · · A.··Well, I would say the colocation is a key
> 11··factor.··Earlier, you asked me what's an assessment, and
> 12··the first part of an assessment is what's there, what's

13··at risk?··So what I was doing was identifying the
14··resources at risk, and, you know, where the potential
15··problems could lie.
16· · · · Q.··Colocation means Galveston Bay?
17· · · · A.··Yes.
18· · · · Q.··Okay.··And Texas Citywide was a different
19··physical location than the Bayport collision in this
20··case, right?
21· · · · A.··Yes.
22· · · · Q.··I mean, there's some, you know, fifteen-mile
23··distance between those two locations?
24· · · · A.··Yes.
25· · · · Q.··Now, turning to opinion -- well, let's go to

·1··Opinion 4, which is on page 13 to 21.··Actually,
·2··Opinion 3.··You say that "the lifestyle of estuary
·3··organisms makes them especially vulnerable to oil
·4··spills."··And then you speak the last sentence about
·5··"benthic invertebrates sensitive to change in
·6··environmental conditions" and "thus biodiversity loss is
·7··an excellent indicator of environmental stress."··What
·8··evidence in this case do you have of any diminishment of
·9··biodiversity?
10· · · · A.··Do you mean in this particular system at that
11··particular time?
12· · · · Q.··That's what I mean.
13· · · · A.··Yes.
14· · · · Q.··Do you have any?
15· · · · A.··No, I have none.
16· · · · Q.··Okay.··In fact, you have no specific sampling,
17··testing, any type of quantitative measurements involved
18··with the particular concentration of reformate in any
19··particular area of Galveston Bay; do you?
20· · · · A.··No.
21· · · · Q.··Is that something that would be important in
22··offering an opinion about whether there's been an impact
23··on the subject populations of, what, only shrimp and
24··oyster, correct, Doctor?··We're only talking about
25··shrimp and oyster here with you.

·1· · · · A.··Yes, that's correct.··Shrimp and oysters.

·2· · · · Q.··Okay.··So would that be something that would be

·3··necessary to consider in offering opinions on the

·4··condition or status of those populations?

·5· · · · A.··So you're asking, would sampling be required?

·6· · · · Q.··Well, knowing how much of what chemical is

·7··present in what location to then say that it is having

·8··an impact on either shrimp or oyster.

·9· · · · A.··Well, it'd give you more information to make an

10··assessment, yes.

11· · · · Q.··Well, what information do you have to make an

12··assessment other than there was a spill?··Do you have

13··any specific information?

14· · · · A.··No.

15· · · · Q.··Okay.··Opinion 4, you say "oil is toxic to

16··estuary organisms."··And you have four bullet points

17··where you discuss mechanisms.

18· · · · · · · · · Do you have any evidence in this case of

19··any of those conditions existing in Galveston Bay after

20··the May 10th, 2019, collision and subsequent spill of

21··the reformate?

22· · · · A.··As I said, I didn't do any specific sampling,

23··so...

24· · · · Q.··The answer is "no"?

25· · · · A.··No.

Exhibit 5 at pp. 29:l–31:25. Dr. Montagna fails to adequately explain why his opinion alone

is sufficient, or how that opinion is reasonably applied to the *facts* of this case—this is

exactly the type of opinion that should be excluded under *Joiner*. 522 U.S. at 146.

In *Vekic v. Wood Energy Corp.*, the District Court for the Eastern District of

Louisiana excluded an expert's opinion in an oyster lease case, finding that: (1) his report

presented no rationale for linking oyster losses to the defendant's activities; (2) the report

contained no information about the frequency and nature of the defendant's operations; and

(3) he did not explain the facts or data on which he based his conclusion that those

operations were a cause in fact of the oyster losses he estimates. 2004 WL 2367732, at *4 (E.D. La. Oct. 20, 2004). The expert apparently calculated a difference in oyster mortality, and then simply assumed that the difference was caused by the defendant's activities. *Id.* This subjective belief and unsupported speculation was not admissible as expert opinion in *Vekic,* and should not pass muster here when an almost identical lack of analysis is presented. *Id.* (citations omitted). The "analyses" conducted by Dr. Montagna and Mr. Johnson include the same faulty assumptions and should not be admissible.

With this lack of evidence or analysis, both Dr. Montagna and Mr. Johnson fail to make a sufficient connection between the reformate spill and the alleged effects on the oysters or Bellwether Claimants. *Vekic*, 2004 WL 2367732, at *4. Merely identifying that a reformate spill has occurred in an area and concluding, without more facts and connective analysis, that such a particular spill has caused the deleterious effects complained of does not satisfy *Daubert* and is *ipse dixit. Id.* The opinions of Dr. Montagna and Mr. Johnson should be excluded because they are mere conclusions reached without critical analysis. *Joiner*, 522 U.S. at 146.

### 4. Dr. Montagna and Mr. Johnson fail to adequately account for possible, alternative explanations.

Even assuming Dr. Montagna's opinions are sufficiently supported, which is denied, experts are required to adequately account for alternative explanations. *Munoz v. Orr*, 200 F.3d 291, 301 (5th Cir. 2000); *Vekic*, 2004 WL 2367732, at *4. Dr. Montagna and Mr. Johnson do not make any effort to rule out possible alternate causes for his alleged deleterious effects caused by the spill, if any. Although Dr. Montagna and Mr. Johnson are not required to disprove or discredit every possible alternative cause, they are required to

provide a basis for his finding that [the Genesis River Interests'] activities more likely than not caused [Bellwether Claimants'] damages." *Vekic*, 2004 WL 2367732, at *4 (citing *Viterbo v. Dow Chemical Co.,* 826 F.2d 420, 424 (5th Cir. 1987) ("Without more than credentials and a subjective opinion, an expert's testimony that 'it is so' is not admissible.")). Here, neither does so, and their opinions should be excluded as a result.

5.      **These seafood opinions are insufficiently supported and should be excluded as nothing more than impermissible, "it-is-so" testimony.**

The crux of Dr. Montagna's and Mr. Johnson's opinions are essentially that a reformate spill occurred, and a substance like reformate can be harmful. But such simplistic reasoning is unreliable because it fails to perform proper testing, relies on insufficient facts, and fails to account for alternative explanations. *Minix v. Canarecci*, 597 F.3d 824, 835 (7th Cir. 2010) (expert's opinion must offer more than the "bottom line"). *"*The expert must explain the methodologies and principles supporting the opinion," which did not occur in this case. *Id.* For these reasons, the Court should exclude the conclusory reports and testimony of Dr. Montagna and Mr. Johnson.

## V.
## PRAYER

For the reasons set forth above, the Genesis River Interests respectfully request this Court to exclude the testimony of Dr. Paul Montagna and Gabriel Johnson. The Genesis River Interests further request all such other and further relief to which they may be entitled.

Respectfully submitted,

By: */s/ Dimitri P. Georgantas*
    Dimitri P. Georgantas
    Texas State Bar No.: 07805100
    Fed. I.D. No.: 2805
    Eugene W. Barr
    Texas State Bar No.: 24059425
    Fed. I.D. No.: 1144784
    Kevin P. Walters
    Texas State Bar No.: 20818000
    Fed. I.D. No. 5649
    ROYSTON, RAYZOR, VICKERY & WILLIAMS, L.L.P.
    1600 Smith Street, Suite 5000
    Houston, Texas 77002
    Telephone: 713.224.8380
    Facsimile: 713.225.9545
    dimitri.georgantas@roystonlaw.com
    eugene.barr@roystonlaw.com
    kevin.walters@roystonlaw.com

    *Attorneys for the Genesis River Interests*

## CERTIFICATE OF SERVICE

I hereby certify that on the 9th day of December, 2021, I served a true and correct copy of the foregoing pursuant to Rule 5 of the Federal Rules of Civil Procedure, via the CM/ECF system and/or electronic mail and/or by depositing in the United States Mail, postage prepaid and properly addressed to all known counsel of record.

          */s/ Dimitri P. Georgantas*
          Dimitri P. Georgantas